**IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT**


**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 54 MAP 2017 |
| | : | |
| Appellant | : | Appeal from the Order of the Superior |
| | : | Court at No. 693 MDA 2016 dated |
| | : | April 11, 2017 Affirming the Order of |
| v. | : | the Court of Common Pleas of |
| | : | Schuylkill County, Criminal Division, at |
| | : | No. CP-54-CR-0001710-2015 dated |
| JOSHUA MICHAEL LUKACH, | : | April 5, 2016. |
| | : | |
| Appellee | : | SUBMITTED:  May 9, 2018 |


## OPINION


**JUSTICE DOUGHERTY**                                    **DECIDED:  October 17, 2018**

We granted discretionary review to determine whether appellee Joshua Michael Lukach, who was subject to a custodial interrogation, clearly and unambiguously invoked his right to remain silent in accordance with the rule articulated in *Berghuis v. Thompkins*, 560 U.S. 370 (2010) and, if so, whether physical evidence collected as a result of his subsequent confession was properly suppressed.  We conclude appellee unambiguously invoked his right to remain silent and was then impermissibly induced into abandoning that right, rendering his confession coerced and involuntary.  As such, both his confession and the physical evidence collected as a result of that confession were properly suppressed.  Accordingly, we affirm the order of the Superior Court.

## I. Background

At approximately 5:00 a.m. on August 6, 2015, Richard Wojciechowsky, Chief of Police with the Pottsville Bureau of Police, received a call from another officer requesting

his presence at the scene of a homicide on South 12th Street in Pottsville. N.T. 1/12/16 at 7-8. Upon arrival, Chief Wojciechowsky observed blood on the roadway and was informed officers had found the body of John Brock (victim) lying in the street in front of his home. *Id.* at 8. During their preliminary investigation of the homicide, officers became aware that appellee and Shavinskin Thomas (Thomas) had been involved in a prior crime at the victim's house and those individuals became persons of interest in the homicide investigation. *Id.* at 9. Officers reported seeing appellee and Thomas walking together on Laurel Boulevard between 6:00 a.m. and 6:30 a.m. on the day the victim's body was found and Chief Wojciechowsky encountered both individuals at the intersection of 12th Street and Market Street, which was directly down the road from the scene of the homicide, at around 11:00 a.m. *Id.* at 10.

During a discussion with Chief Wojciechowsky, appellee stated he was in the area to see what was happening. *Id.* at 10-11. Appellee further stated he had been with Thomas for the entire previous evening and they had visited the APlus store on Route 61 around 5:00 a.m. *Id.* Officers proceeded to the APlus store which provided two still photographs from their surveillance videos showing the only customers who entered the store around 5:00 a.m. that day. *Id.* Neither still photograph showed appellee entering the store. *Id.* Later that same day, around 5:00 p.m., Chief Wojciechowsky proceeded to appellee's residence, advised his mother of the homicide, and stated he wished to speak to appellee. *Id.* at 20. Appellee was not home, but his mother consented to a search of the property. *Id.* at 20-21. During the search of the property, officers recovered box cutters from a toolbox in appellee's bedroom and a pair of work gloves from the backyard, both of which were similar to items found at the scene of the homicide. *Id.* at 21.

Appellee was detained the next day based on two outstanding warrants and was taken to an interview room at Pottsville City Hall. *Id.* at 12. Chief Wojciechowsky turned on an audio and visual recorder, read appellee his *Miranda*[1] rights, and began to interview appellee regarding the homicide of the victim. *Id.* at 13-14. During the initial stages of the interview, which began at 1:05 p.m., appellee continuously denied being involved in the homicide. *Id.* at 16. Subsequent to these initial denials, the following exchange took place between 1:25 p.m. and 1:30 p.m.:

CHIEF: And at some point you have a responsibility to yourself like we talked about but also your family and also your mom.

APPELLEE: I know.

CHIEF: For as much shit as you've been in, I'm guessing you haven't cut her out of your life. You still care there.

APPELLEE: Yeah a little bit.

CHIEF: It's not perfect right.

**APPELLEE: Yeah. I don't know just, I'm done talking. I don't have nothing to talk about.**

CHIEF: You don't have to say anything, I told you that you could stop.

APPELLEE: Ok.

CHIEF: Let me explain to you then, alright?

APPELLEE: [Y]eah.

CHIEF: We don't believe you right now.

APPELLEE: Uh huh.

CHIEF: And we are in the process of getting our stuff back from the lab and we are in the process of interviewing other people who want to give us information. So as that's being put together and it suggests that you are involved, you lose your right to tell me something different. You lose your right to distance yourself from anything that you weren't directly involved with. You lose your right to control what happens to you for however many years however long.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

APPELLEE:   Yeah.

CHIEF:   And I've talked to people like this before and they've made the wrong choice with not speaking to me and I will tell them everything else that is going to happen to them because we are arresting them and because we have the evidence and they start bawling and they say they want to talk now. And I'm going to tell you that the answer to that is no.

APPELLEE:   Yeah.

CHIEF:   Because you['re] a kid from the street and you know how respect works. Respect is me now sitting with you and giving you a chance. You disrespect me by lying and I'm not gonna give you another chance because you are a man now.

APPELLEE:   Yeah.

CHIEF:   You get one. That's where we are going from here and that's how it's gonna play out. [The time is] 1:30.

   20 Second Pause (silence)

CHIEF:   I'm hoping we get a call here pretty soon from the lab about some[ ] of this stuff.

APPELLEE:   Yeah

CHIEF:   We will wait a couple minutes with you.

APPELLEE:   Alright.

CHIEF:   And then when they call if they say that stuff is there indicating that you were in the area, or [Thomas], because you said you were with him all night.

APPELLEE:   Yeah.

CHIEF:   Then at the point, we are not working on any kind of.. We aren't going to come from the direction of trying to help you anymore.

APPELLEE:   Yeah.

Joint Submission of Transcription of Confession (Confession Transcript) at 16-17 (emphasis added). Chief Wojciechowsky continued talking to appellee regarding testing at the lab and then left the room for approximately eight minutes. *Id.* at 18. While Chief Wojciechowsky was outside the interview room, another officer entered the room, asked

for appellee's shoes, and appellee complied. *Id.* Chief Wojciechowsky then re-entered the room and discussed with appellee the types of evidence that could be found on his shoes; appellee continued to deny involvement in the homicide. *Id.* at 18-22.

Thereafter, at around 1:53 p.m., appellee asked Chief Wojciechowsky if he could ask him a quick question off camera. *Id.* at 22. After their off-the-record conversation, Chief Wojciechowsky turned the camera back on, re-advised appellee of his *Miranda* rights, and appellee asked to speak with someone from the Schuylkill County District Attorney's Office in regards to whether he could receive a deal in exchange for his cooperation. *Id.* at 23-25. Chief Wojciechowsky again turned the camera off and there was a break in the interview from approximately 2:00 p.m. until 2:22 p.m. when John Fegley (ADA Fegley) from the District Attorney's Office arrived. *Id.* at 26. Appellee was again advised of his *Miranda* rights and he subsequently confessed to participating in the victim's murder. *Id.* at 26-52.

During his confession, appellee stated he used one of the victim's credit cards to access an ATM and then placed it in a storm drain. *Id.* at 44-48. Officers subsequently recovered the credit card, a pair of sunglasses, a t-shirt, and a hat in a storm drain. N.T. 1/12/16 at 43-44. Based on the confession and the recovery of the credit card, officers were able to retrieve video which showed appellee accessing an ATM around the time of the homicide. *Id.* at 43. Appellee was subsequently arrested and charged with the murder of the victim and related offenses.

Prior to trial, appellee filed a motion to suppress any statements made to the police after he stated, "Yeah. I don't know just, I'm done talking. I don't have nothing to talk about" (hereinafter referred to as "appellee's invocation" or "his invocation"). The motion further requested that appellee's shoes and any other evidence recovered as a result of those statements, including the items found in the storm drain and the ATM video, also

be suppressed. The suppression court held a hearing on the motion in which it viewed a video recording of appellee's invocation and read a transcription of appellee's full confession. The court also heard testimony from Chief Wojciechowsky, who testified to the above facts, and Detective Kirk Becker, who stated he would have retrieved the ATM video in the normal course of his investigation by contacting the victim's banks to determine if any of his accounts had been accessed subsequent to his death. *Id.* at 45. The suppression court subsequently filed an opinion and order, granting the motion in part and denying the motion in part.

The suppression court first determined "the statements by [appellee] which followed the words, 'I'm done talking. I don't have nothing to talk about,' are [ ] suppressed as having been obtained in violation of his Fifth Amendment[2] privilege against self-incrimination." Suppression Court Op. 4/5/16 at 34. The court based its suppression of these statements on its finding appellee unambiguously invoked his right to remain silent by stating "I'm done talking. I don't have nothing to talk about[.]" *Id.* at 34. The court further suppressed the items found in the storm drain as evidence derivative of the illegally obtained confession.[3] The court found this case to be distinguishable from *United States*

---

[2] The Fifth Amendment to the United States Constitution states, in relevant part, as follows: "No person shall … be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V.

[3] The lower court also suppressed appellee's shoes, finding the Commonwealth failed to prove "the police inevitably or ultimately would have obtained the shoes by legal means" or that appellee "relinquished his shoes by voluntarily consenting to do so[.]" Suppression Court Op. 4/15/16 at 36-39. Additionally, the lower court declined to suppress the ATM video as it found Detective Becker's testimony sufficiently established the video would have been recovered during the homicide investigation notwithstanding appellee's suppressed confession. *Id.* at 34-35, *citing Commonwealth v. Ingram*, 814 A.2d 264 (Pa. Super. 2002) (taint of illegal police activity purged where discovery inevitable). The suppression of appellee's shoes and the admissibility of the ATM video are not at issue in this appeal.

*v. Patane*, 542 U.S. 630 (2004) (plurality), and *Commonwealth v. Abbas*, 862 A.2d 606 (Pa. Super. 2004), both of which held derivative physical evidence need not be suppressed in the absence of an actual coerced statement. *Id.* at 41. Here, the suppression court held appellee's confession was coerced as the continuing interrogation[4] by Chief Wojciechowsky was "meant to pressure [appellee] into relinquishing his right" and "the statements he thereafter made were 'the product of compulsion, subtle or otherwise.'" *Id.*, *quoting Miranda v. Arizona*, 384 U.S. 436, 474 (1966).

The Commonwealth appealed to the Superior Court pursuant to Pa.R.A.P. 311(d),[5] and the suppression court filed an opinion pursuant to Pa.R.A.P. 1925(a), in which it relied on its previously filed opinion regarding appellee's suppression motion. The Commonwealth argued appellee's invocation was ambiguous and any violation of his right to remain silent was cured when appellee was once again read the *Miranda* warnings and waived those rights prior to speaking with ADA Fegley. The Commonwealth further argued the physical evidence obtained as a result of appellee's voluntary confession should not have been suppressed because Fifth Amendment violations preclude only the admissibility of testimonial evidence where no coercion is present. Appellee responded by arguing the assertion of his right to remain silent was clear and unambiguous and Chief Wojciechowsky's continued interrogation became coercive, rendering any further

---

[4] Although Chief Wojciechowsky's statements to appellee following his invocation did not constitute direct questioning, such statements are still considered interrogation as they were "words or actions … that the police should know are reasonably likely to elicit an incriminating response[.]" *Commonwealth v. Briggs*, 12 A.3d 291, 322 (Pa. 2011), *quoting Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

[5] Pennsylvania Rule of Appellate Procedure 311(d) states, "In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution." Pa.R.A.P. 311(d).

statements by appellee to be involuntary and, in turn, the derivative physical evidence to be inadmissible.

A three-judge panel of the Superior Court affirmed the suppression order. *Commonwealth v. Lukach*, 163 A.3d 1003 (Pa. Super. 2017). The panel first concluded although appellee's invocation may have been ineloquently phrased, it was "not qualified[,]" "not ambiguous[,]" "not equivocal[,]" and "would lead a reasonable police officer, in those circumstances, to understand [it] to be a request to remain silent." *Id.* at 1010. The Superior Court further held the continued interrogation of appellee by Chief Wojciechowsky violated appellee's Fifth Amendment rights as he failed to scrupulously honor appellee's request to remain silent, and appellee's subsequent waiver of his *Miranda* rights before speaking to ADA Fegley did not cure that violation or render his confession voluntary.[6] *Id.* at 1012-1013. Lastly, the panel held the derivative physical evidence obtained as a result of appellee's involuntary confession was properly suppressed as the Commonwealth failed to provide sufficient grounds demonstrating how the evidence would have been discovered absent appellee's confession. *Id.* at 1014.

We accepted review to address whether appellee's invocation was clear and unambiguous as required by *Berghuis*, thus necessitating suppression of his confession and, if so, whether the Superior Court properly affirmed the suppression of the derivative physical evidence recovered as a result of that confession.[7] As both questions ask us to

---

[6] The issue of whether appellee's waiver of his *Miranda* rights prior to speaking to ADA Fegley cured any previous violation of his right to remain silent is not before this Court.

[7] Specifically, we granted allocatur on the following questions:

a. As a matter of first impression, did the Pennsylvania Superior Court err in holding that a suspect that is subject to custodial interrogation clearly and unambiguously invokes his right to remain silent under the standard articulated in [*Berghuis*], where he makes a statement that he does not wish

review an order granting suppression, we "consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted" when read in the context of the suppression hearing record as a whole. *Commonwealth v. Mistler*, 912 A.2d 1265, 1268-69 (Pa. 2006); *In the Interest of L.J.*, 79 A.3d 1073, 1085 (Pa. 2013). "Where the record supports the suppression court's factual findings, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." *Commonwealth v. Johnson*, 160 A.3d 127, 138 (Pa. 2017) (internal citations omitted). However, "where the appeal ... turns on allegations of legal error, the suppression court's conclusions of law are not binding" as it is this Court's duty "to determine if the suppression court properly applied the law to the facts." *Mistler*, 912 A.2d at 1269 (internal citations, brackets, and ellipsis omitted). As such, the legal conclusions of the lower courts are subject to our plenary review. *Id.*

## II. Suppression of Confession

The Commonwealth argues appellee's invocation was not clear and unambiguous as required by *Berghuis*. The Commonwealth contends appellee's invocation could have been construed as a general denial of being involved in the murder rather than an invocation of his right to remain silent since "I'm done talking" was prefaced by "I don't know" and qualified by "I don't have nothing to talk about."

---

to talk, but, qualifies that statement with a statement of "I don't know" and a general assertion of innocence?

b. Did the Pennsylvania Superior Court commit an error of law when it applied the wrong legal standard in affirming suppression of the physical evidence found as 'fruits' of [appellee's] confession where there was only a violation of the prophylactic rules of *Miranda* and the confession was not a product of coercion?

*Commonwealth v. Lukach*, 170 A.3d 1064 (Pa. 2017) (*per curiam*).

The Commonwealth first supports this contention by comparing two Superior Court cases decided prior to *Berghuis*. *See* Commonwealth's Brief at 11-12, *citing Commonwealth v. Boyer*, 962 A.2d 1213 (Pa. Super. 2008); *Commonwealth v. Russell*, 938 A.2d 1082 (Pa. Super. 2007). The Commonwealth contends these cases suggest an invocation of the right to remain silent is unambiguous only when it is unqualified since Boyer's statement, "I don't want to talk to you" — made immediately after being read his *Miranda* warnings and unqualified by any other words — was found to be unambiguous, while Russell's statement she did not wish to speak to a particular officer with whom she was angry was held to be qualified and ambiguous. Also cited by the Commonwealth is *Commonwealth v. Champney*, 65 A.3d 386 (Pa. 2013), in which this Court was equally divided on the question of whether the words "I think" prior to a request for counsel rendered that request unambiguous.[8] The Commonwealth contends this case is distinguishable from and easier to decide than *Champney* because the words "I don't know" at issue here impart more ambiguity than the words "I think" at issue in *Champney*. The Commonwealth further suggests cases from other jurisdictions should guide our decision since there is no binding precedent from our Court. Commonwealth's Brief at 14-19, *citing Owen v. Florida Dept. of Corrections*, 686 F.3d 1181 (11th Cir. 2012) (right to remain silent not unambiguously asserted where suspect states "I'd rather not talk about it" and then "I don't want to talk about it" 30 minutes apart); *United States v. Adams*, 820 F.3d 317 (8th Cir. 2016) (right to remain silent not unambiguously asserted where suspect states "Nah, I don't want to talk, man. I mean, I …"); *State v. Cummings*, 850 N.W.2d 915 (Wis. 2014) ("I don't know nothing about this" proclaims innocence while "I don't want to talk about this" indicates desire to end questioning).

---

[8] Former Justice Orie Melvin did not participate in the decision.

The Commonwealth ultimately argues the Superior Court erred by not engaging in a meaningful discussion of the above cases and instead making a conclusory determination that appellee's invocation was an unambiguous assertion of his right to remain silent. The Commonwealth contends the Superior Court should have compared appellee's invocation with the purported invocations made in the above cases and refrained from crafting a rule that leaves police officers guessing as to whether the "middle portion" of a qualified invocation is what the suspect actually meant. Commonwealth's Brief at 19-20, *citing Davis v. United States*, 512 U.S. 452, 461 (1994) (mandating an officer not be forced "to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong").

Appellee responds by arguing his invocation of his right to remain silent was unequivocal, and the cases cited by the Commonwealth are distinguishable. Appellee argues *Russell* is distinguishable because the defendant there qualified her invocation by stating she did not wish to speak to the arresting officer, whereas here appellee simply stated, "I'm done talking." Appellee's Brief at 11, *citing Russell, supra.* Appellee further argues the Commonwealth misconstrues the holding in *Cummings* as the officers in that case were questioning the defendant regarding two separate crimes, and this fact rendered his statements, "I don't want to talk about this" and "I don't know nothing about this" ambiguous since it was unclear whether he wished to stop the questioning altogether or was asserting innocence as to one of the two crimes. Appellee's Brief at 12-13, *citing Cummings*, 850 N.W.2d at 928.

Appellee further asserts *Adams* is distinguishable because the defendant continued to answer questions after stating, "I don't want to talk man. I mean, I …" Appellee's Brief at 13-14, *citing Adams*, 820 F.3d at 319-20. Appellee claims in this case,

Chief Wojciechowsky acknowledged he had invoked his right to remain silent by responding, "You don't have to say anything, I told you that you could stop," and appellee did not re-engage Chief Wojciechowsky in conversation but only replied, "Yeah" to his continuous "badgering" regarding evidence they had collected. Appellee's Brief at 9-11, 13-14. Appellee also finds *Owen* distinguishable because the defendant initiated much of the questioning by police and his statements, "I'd rather not talk about it" and "I don't want to talk about it" were in response to specific questions regarding individual details of the crime rather than general questions about the crime. Appellee's Brief at 14-15, *citing Owen, supra*. Appellee ultimately contends the exchange between Chief Wojciechowsky and himself, taken as a whole, shows the invocation of his right to remain silent was unambiguous, Chief Wojciechowsky was aware of this invocation, and Chief Wojciechowsky's continuous "badgering" after the invocation was intended to induce appellee to abandon his right to remain silent.[9] Appellee's Brief at 9-11, 14-15.

This Court has previously enunciated, "[t]he principles surrounding *Miranda* warnings are [ ] well settled. The prosecution may not use statements stemming from a custodial interrogation of a defendant unless it demonstrates that he was apprised of his right against self-incrimination and his right to counsel." *Commonwealth v. Gaul*, 912 A.2d 252, 255 (Pa. 2006) (citation omitted). Appellee does not dispute that Chief Wojciechowsky apprised him of his *Miranda* rights prior to the custodial interrogation. Instead, the lower courts held Chief Wojciechowsky violated appellee's Fifth Amendment right to remain silent when he continued to interrogate him following his invocation.

---

[9] Appellee additionally argues Chief Wojciechowsky failed to scrupulously honor the invocation of his right to remain silent and any subsequent waiver of his *Miranda* rights did not cure that violation. However, as stated, this issue is not currently before the Court. *See* n.5, *supra*.

We have long held "if an individual is given the *Miranda* warnings and responds that he wishes to exercise any of those rights, all interrogation must cease." *Commonwealth v. Mercier*, 302 A.2d 337, 339 (Pa. 1973), *citing Miranda*, 384 U.S. at 474. However, with respect to the *Miranda* right to have counsel present during a custodial interrogation, the United States Supreme Court has held courts must make an "objective inquiry" into determining whether such an invocation was unambiguous by stating, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis*, 512 U.S. at 459 (emphasis in original). In *Berghuis*, the High Court expanded the unambiguous invocation rule to include the *Miranda* right to remain silent by finding "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel at issue in *Davis*." *Berghuis*, 560 U.S. at 381. As aptly summarized by the Superior Court below,

> the defendant [in *Berghuis*] was silent during the first two hours and forty-five minutes of a three-hour interrogation. *Berghuis*, [560 U.S. at 374-76]. He did not state that he wished to remain silent, that he did not want to talk to the police, or that he wanted an attorney. *Id.* However, towards the end of the interrogation, a police officer asked defendant whether he prayed to God to forgive him for the shooting, to which the defendant responded, "Yes." [*Id.* at 376]. The defendant refused to sign a written confession and argued that his statement to detectives should have been suppressed because he had invoked his right to remain silent. *Id.*

*Lukach*, 163 A.3d at 1008. In holding Berghuis failed to unambiguously invoke his right to remain silent, the High Court explained he "did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his right to cut off questioning. Here

he did neither, so he did not invoke his right to remain silent." *Berghuis*, 560 U.S. at 382 (internal citation and quotation omitted).

This case is readily distinguishable from *Berghuis* as appellee did not sit silent like the defendant in *Berghuis*, but instead stated he was "done talking." Confession Transcript at 16. "I'm done talking" is virtually indistinguishable from the "simple, unambiguous statement[]" of "say[ing] that he wanted to remain silent" referred to by the *Berghuis* Court. 560 U.S. at 382. However, we recognize the Commonwealth has argued appellee rendered his invocation ambiguous by prefacing it with "I don't know" and qualifying it with "I don't have nothing to talk about." Additionally, we note this Court has no requisite precedent on this issue as we have only cited *Berghuis* on two occasions: in a footnote, *see Commonwealth v. Briggs*, 12 A.3d 291, 318 n.27 (Pa. 2011), and in a case in which the Court was equally divided. *See Champney*, 65 A.3d at 388 n.2 (Opinion in Support of Affirmance (OISA)), 404 (Opinion in Support of Reversal (OISR)). Accordingly, we consider the persuasive authorities cited by the Commonwealth and whether those cases are applicable here before definitively determining whether appellee's invocation was an unambiguous invocation of his right to remain silent.[10]

We begin with pre-*Berghuis* case law from our Superior Court. In *Russell*, Detective Rush of the Pittsburgh Police Department arrested the defendant, read her the *Miranda* warnings, and attempted to interrogate her regarding an arson. 938 A.2d at 1085-86. Russell stated she did not want to speak to Detective Rush because she was angry with him for arresting her and the interrogation ceased. *Id.* at 1090. Two hours later, Detective Rush requested that Russell speak with Detective Canofari. *Id.* Detective

---

[10] Many of the decisions discussed below determined whether or not invocations of the *Miranda* right to counsel — rather than the *Miranda* right to remain silent — were unambiguous. However, as we have noted, the same standards apply for determining whether or not an invocation of the right to remain silent was unambiguous. *See Berghuis*, 560 U.S. at 381.

Canofari re-read the *Miranda* warnings to Russell and spoke with her about her background.  *Id.* at 1091.  Thereafter, Russell agreed to speak with Detective Canofari about the fire and subsequently confessed to her role in setting it.  *Id.*  The Superior Court affirmed the trial court's denial of Russell's motion to suppress her confession.  The panel held the detectives did not act "coercively in order to force [Russell] into abandoning her right to remain silent" because "[her] initial assertion of her right to remain silent was qualified, *i.e.*, she indicated to Detective Rush that she did not wish to speak with **him** because she was angry with **him** for arresting her" and "in accordance with [that] stated preference, another detective spoke with her and did so in a neutral fashion after reiterating her *Miranda* rights."  *Id.* (emphasis in original).

A year later, *Russell* was distinguished by the Superior Court in *Boyer*.  In *Boyer*, the defendant was arrested for robbery and taken to the state police barracks for questioning by Trooper 1 who read him the *Miranda* warnings.  962 A.2d at 1216.  In response, Boyer stated "I don't want to talk to you" and Trooper 1 left the interview room.  *Id.*  At the same time, Trooper 2 arrived at the barracks, entered the interview room, and questioned Boyer without administering *Miranda* warnings.  *Id.*  Boyer subsequently confessed to Trooper 2 and he was convicted of the robbery.  *Id.*  On collateral review, the Superior Court reversed the PCRA court's determination Boyer's trial counsel could not be found ineffective for failing to assert that the troopers violated Boyer's right to remain silent because, based on *Russell*, Boyer had not invoked that right.  *Id.* at 1217-18.  In doing so, the panel distinguished *Russell* and rejected the argument that Boyer's "refusal to speak with Trooper 1 was not an invocation of his right to remain silent or was somehow qualified to the extent that Trooper 2 need not have read [Boyer] his rights[,]" because there was no evidence Boyer "told Trooper 1 he would be willing to speak if another trooper conducted the interview[,]" as Russell had done.  *Id.* at 1218.  The panel

thus held Boyer exercised his right to remain silent and Trooper 2 violated that right by interrogating him almost immediately thereafter. *Id.*

We now review cases from other jurisdictions. In the 11th Circuit case, *Owen*, the defendant was arrested on burglary charges and was questioned six times over the next three weeks regarding a plethora of unrelated crimes. 686 F.3d at 1183-84. During each session, Owen was advised of his *Miranda* rights, waived those rights, and expressed a desire to confess to crimes so long as the police could convince him they had enough evidence for a conviction. *Id.* at 1184. Over the course of the first five sessions, Owen confessed to numerous burglaries, sexual batteries, and other crimes. *Id.* Police then obtained Owen's footprint through court order, compared it to a footprint found at a murder scene, initiated the sixth interrogation of Owen, and questioned him regarding two murders. *Id.* Owen confessed to one murder based on fingerprints found at the scene and answered questions pertaining to the details of that crime. *Id.* Officers then described similarities between the murder Owen confessed to and a second murder in an attempt to have Owen confess to that murder as well. *Id.* During questioning, Owen freely responded to most of the questions asked by police. *Id.* However, when asked why he had chosen the particular house where the second murder was committed, Owen responded, "I'd rather not talk about it" and when asked where he put the bicycle he used, Owen responded, "I don't want to talk about it." *Id.* at 1185. The Eleventh Circuit Court of Appeals found no error in the Florida Supreme Court's determination those statements by Owen did not constitute an unequivocal invocation of his right to remain silent. *Id.* at 1194. The Court of Appeals explained the statements were "in response to questions about very specific details, in the midst of a give-and-take discussion of the evidence against Owen" and the officers reasonably could have believed Owen's statements were

not meant to invoke his right to remain silent as "Owen used the pronoun 'it,' which could have referred to the specific detail being asked about." *Id.* at 1193-94.

In *Adams*, the defendant was arrested for bank robbery, informed of his *Miranda* rights, declined to answer questions, and the interrogation was terminated. 820 F.3d at 320. Two weeks later, an FBI agent visited Adams in jail, advised him of his *Miranda* rights, and began questioning him. *Id.* About six minutes into the questioning, Adams stated "Nah, I don't want to talk, man. I mean, I…" *Id.* The FBI agent cut Adams off at that point and continued to question him, and Adams responded to the questions. *Id.* at 321. The interview continued for another sixteen minutes, during which Adams stated he was innocent and that he sold his white Dodge Durango — a vehicle which had been seen parked at the bank — prior to the robbery. *Id.* at 321-22. The Eighth Circuit Court of Appeals affirmed the denial of Adams's motion to suppress his confession to the FBI agent, finding "[t]he phrase 'I mean' signaled that Adams intended to clarify the statement, 'I don't want to talk, man,' and the statement was therefore ambiguous." *Id.* at 323. The court further found relevant the fact that Adams "continued to talk with [the FBI agent] for an additional sixteen minutes, never clarifying his earlier statement or otherwise unequivocally invoking his right to remain silent." *Id.*

In *Cummings*, the defendant Smith[11] was questioned regarding the nonviolent theft of a van and a series of violent armed robberies. 850 N.W.2d at 922. Milwaukee Police Detective Guy advised Smith of his *Miranda* rights and Smith discussed his involvement in the theft of the van. *Id.* When Detective Guy began asking Smith questions regarding the armed robberies, Smith first stated, "I don't want to talk about this. I don't know

---

[11] The Supreme Court of Wisconsin consolidated the unrelated cases of Cummings and another defendant, Smith, as both argued they unequivocally invoked the right to remain silent during police interrogations. 850 N.W.2d at 917-18. Our review of that decision refers only to the appeal of Smith.

nothing about this" and later stated, "I'm talking about this uh van. This stolen van. I don't know nothing about this stuff. So, I don't even want to talk about this." *Id.* at 922-23. Detective Guy then returned to the topic of the stolen van, but later began talking about the armed robberies again to which Smith stated he didn't "know nothing about no robbery" and "I don't rob people." *Id.* at 923. Although it was a "close call[,]" the Supreme Court of Wisconsin affirmed the denial of Smith's motion to suppress his confession. *Id.* at 927. The court explained it was "not clear whether Smith's statements were intended to cut off questioning about the robberies, cut off questioning about the minivan, or cut off questioning entirely" and "while 'I don't want to talk about this' seems to indicate a desire to cut off questioning, 'I don't **know** nothing about this' is an exculpatory statement proclaiming Smith's innocence" which is "incompatible with a desire to cut off questioning." *Id.* at 928 (emphasis in original).

Our review reveals these non-binding authorities are factually distinguishable from the case *sub judice*. Appellee did not state he would not talk to a particular officer (*Russell*), he was not being interrogated regarding multiple crimes (*Owen* and *Cummings*), and he did not continue to engage in a back-and-forth conversation with police immediately following his invocation (*Adams*), but instead only responded, "Yeah" to Chief Wojciechowsky's commentary during the continuing interrogation. Confession Transcript at 16-17. We find this case most closely aligns with *Boyer* — where the Superior Court found Boyer's invocation to be unambiguous — as both appellee and Boyer invoked their right to remain silent but police nevertheless immediately continued to interrogate them unremittingly. However, we recognize Boyer's invocation was not prefaced by "I don't know" as is the case here.

Regarding the Commonwealth's argument "I don't know" rendered appellee's invocation ambiguous, we consider the facts of this case to be analogous to those in

*Champney*, in which this Court was equally divided.[12]  In *Champney*, the defendant was arrested on robbery charges, placed in county prison, and was represented by Attorney Frank Cori.  65 A.3d at 393 (OISR).  As the police planned on questioning Champney regarding an unrelated murder, they contacted Frank Cori who assured them he only represented Champney in the robbery case.  *Id.*  As officers were transporting Champney to a hearing concerning the robbery case, one officer asked Champney if he shot the murder victim and he replied, "'I think I should talk to Frank Cori before I make any statement.'"  *Id.*  The officer did not ask any further questions and transcribed Champney's statement in a police report.  *Id.*  Months later, the same officer met with Champney on two occasions and Champney made incriminating statements regarding the murder on both occasions.  *Id.* at 393.  On collateral review, the PCRA court found counsel to be ineffective for failing to challenge the admission of Champney's statements on the grounds that he had previously invoked his right to counsel, and granted Champney a new trial.  *Id.* at 395-96.  The Commonwealth appealed the decision to this Court, arguing Champney's invocation of his right to remain silent was equivocal because it was prefaced by "I think[.]"  *Id.* at 399.  As a result of this Court's 3-3 deadlock, the decision of the PCRA court was affirmed as a matter of law.  *Id.* at 386 (*per curiam* order).

In support of the holding Champney unambiguously asserted his right to counsel, the OISA distinguished the facts of Champney's situation from those present in the Supreme Court's decision in *Davis.*[13]  Specifically, the OISA noted Champney "did not

_____

[12] As stated, Justice Orie Melvin did not participate in the decision.  Justice Baer authored the opinion in support of affirmance (OISA), and was joined by Justice (now-Chief Justice) Saylor and Justice Todd; Justice Eakin authored the opinion in support of reversal (OISR), and was joined by then-Chief Justice Castille and Justice McCaffery.

[13] During an interrogation concerning a murder, Davis stated, "Maybe I should talk to a lawyer."  *Davis*, 512 U.S. at 455.  As they were unsure whether that comment constituted an invocation of his right to counsel, the officers asked Davis whether he was requesting a lawyer and he responded, "No, I'm not asking for a lawyer[.]"  *Id.*  Questioning resumed,

provide a second statement contradicting his initial desire to speak with counsel." *Id.* at 388 (OISA). The OISA also declined to equate "I think" with the equivocal term "maybe" used by Davis. *Id.* The OISA rejected the idea "that employment of the phrase 'I think,' in and of itself renders [Champney's] statement equivocal, as such term can be colloquially used to express one's beliefs and not to suggest that one is pondering or contemplating an action." *Id.* The OISA concluded there was no reason to disturb the findings of the PCRA court, especially in light of the context in which Champney's statement was made. The OISA specifically pointed to the PCRA court's holding that the "import of [Champney's] statement was clear" as it was "a declaration of a desire to consult with a particular counsel prior to any further interrogation" which followed an "obvious request for an admission of guilt." *Id.* The OISR came to the opposite conclusion, finding the case to be indistinguishable from *Davis* by stating, "[q]ualifying any declaration with the words 'I think' is simply not the same as asserting an unambiguous decision. If our Court could examine and characterize the tone, demeanor, emphasis, or body language of the declarant, we might be allowed to find the sentiment expressed by Champney was other than ambiguous — but we are not afforded that opportunity." *Id.* at 404 (OISR).

We conclude the OISA in *Champney* is particularly applicable and persuasive here for a variety of reasons. First, the phrase "I don't know" as used by appellee here, in the context of his exchange with Chief Wojciechowsky, does not render his invocation *per se* equivocal because "I don't know" may have simply been responsive to Chief

_____

Davis made inculpatory statements, he then stated, "I think I want a lawyer before I say anything else[,]" and the officers ended the interrogation. *Id.* Although they noted it was good practice, the High Court declined to adopt a rule requiring police to further question suspects in an attempt to clarify ambiguous references to counsel. *Id.* at 461-62. The Court also declined to adopt a rule requiring questioning to stop when a "suspect **might** want a lawyer" and found no reason to disturb the lower court's finding "Maybe I should talk to a lawyer" was not a request for counsel. *Id.* at 462 (emphasis in original).

Wojciechowsky's prior questioning regarding appellee's relationship with his mother. Confession Transcript at 16; *see also Champney* 65 A.3d at 388 (OISA) (discussing context of Champney's statement). Additionally, just like the prefatory phrase "I think," the prefatory phrase "I don't know" does not automatically render any statement that follows ambiguous. The phrase "I don't know" can also "be colloquially used to express one's beliefs and not to suggest that one is pondering or contemplating an action." *Id.* Further, even if we were to believe that the use of the phrase "I don't know" suggested appellee was "contemplating an action[,]" it is logical to conclude the ensuing statement of "I'm done talking" meant appellee had finished "contemplating" and had definitively made up his mind. Appellee further evidenced his desire to end the interrogation by telling Chief Wojciechowsky that he had "nothing to talk about." Confession Transcript at 16. Moreover, although we obviously have not had the opportunity to "examine and characterize the tone, demeanor, emphasis, or body language of the declarant[,]" *Champney*, 65 A.3d at 404 (OISR), it is clear the suppression court did have that opportunity when it viewed the video recording and determined appellee's invocation was unambiguous notwithstanding the fact it was prefaced by the phrase "I don't know." *See* N.T. 1/12/16 at 36-37; Suppression Court Op. 4/5/16 at 41.

Lastly, we recognize the import of the *Davis* Court's declaration that the invocation of a *Miranda* right must be clear as police officers should not be required "to make difficult judgment calls about whether the suspect in fact wants a lawyer even though he has not said so, with the threat of suppression if they guess wrong." *Davis*, 512 U.S. at 461. At the same time, we observe there was no "difficult judgment call" or "guess" called for in this case. Appellee stated, "I don't know just, I'm done talking. I don't have nothing to talk about[,]" and Chief Wojciechowsky immediately replied, "You don't have to say anything, I told you that you could stop." Confession Transcript at 16. Under the

circumstances, there can be no doubt Chief Wojciechowsky understood appellee's statement as an invocation of his right to remain silent. Accordingly, we find no reason to disturb the lower courts' determination that appellee's invocation was clear and unambiguous, and Chief Wojciechowsky violated appellee's right to remain silent when the interrogation continued after his invocation. We therefore affirm the suppression of all statements made by appellee following his invocation.

### III. Suppression of Derivative Physical Evidence

We now consider whether the physical evidence recovered by police as a result of appellee's confession was properly suppressed. The Commonwealth argues the Superior Court, in suppressing the derivative physical evidence under a straightforward fruits of the poisonous tree analysis, failed to address the United States Supreme Court's decision in *United States v. Patane*, 542 U.S. 630 (2004) (plurality), and its own subsequent decision in *Commonwealth v. Abbas*, 862 A.2d 606 (Pa. Super. 2004). The Commonwealth contends these cases held the fruit of the poisonous tree doctrine does not apply to physical evidence discovered in reliance on an illegally obtained confession so long as the confession was made voluntarily and was not coerced. The Commonwealth contends there was no evidence of coercion here as the interrogation was relatively short, it was conducted in a standard interrogation room, appellee was read his rights and understood those rights, appellee was not under any apparent physical or psychological stress, and the interrogation remained cordial and polite throughout. Commonwealth's Brief at 24-25, *citing Withrow v. Williams*, 507 U.S. 680, 693-94 (1993) (listing factors for determining voluntariness of confession). The Commonwealth insists that, since the confession was not coerced, the fruits of that confession — the derivative physical evidence — should not have been suppressed.

Appellee responds by arguing the derivative physical evidence was properly suppressed and the controlling law on the issue is *United States v. Hubbell*, 530 U.S. 27 (2000), which held a *Miranda* violation raises a presumption of coercion and the privilege against self-incrimination extends to the exclusion of derivative evidence. Appellee's Brief at 26. Appellee contends *Patane* and *Abbas* are distinguishable from the case at hand as they dealt with confessions that were taken in violation of *Miranda*, but were still considered voluntary, whereas here, Chief Wojciechowsky used coercive tactics to illegally force appellee into abandoning his right to remain silent. *Id*. at 27-29. Appellee argues the focus for determining whether a confession is voluntary "'is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess.'" *Id*. at 29, *quoting Commonwealth v. Templin*, 795 A.2d 959, 966 (Pa. 2002). Appellee argues he was coerced into confessing as Chief Wojciechowsky continuously made statements regarding the imminent receipt of information from the lab, even after appellee asked to stop the interview. *Id*. Appellee lastly claims the actions of the police in this case were "so abhorrent, that the suppression of the physical evidence obtained as a result of that confession is required in order to deter further police misconduct." *Id*.

In *Miranda*, the United States Supreme Court "concluded that the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk that an individual will not be 'accorded his privilege under the Fifth Amendment … not to be compelled to incriminate himself.'" *Dickerson v. United States*, 530 U.S. 428, 435 (2000), *quoting Miranda*, 384 U.S. at 439. As such, the Court laid down guidelines which "established that the admissibility in evidence of any statement given during custodial interrogation of a suspect would depend on whether the police

provided the suspect with [the *Miranda*] warnings." *Id*. Although the High Court had

repeatedly referred to the *Miranda* warnings as prophylactic, in *Dickerson* it held those

warnings were constitutionally required. *Id*. at 444.

In the wake of *Dickerson*, the High Court was faced with the question of whether

the failure to provide a suspect with the constitutionally mandated *Miranda* warnings

required suppression of the derivative physical evidence obtained as a result of "the

suspect's unwarned but voluntary statements." *Patane*, 542 U.S. at 633-34. In *Patane*,

the defendant was arrested for violating a restraining order. *Id*. at 635. The arresting

officer attempted to advise Patane of his *Miranda* rights, but Patane interrupted him and

stated he knew his rights. *Id*. The officer did not attempt to complete the warnings and

began to ask Patane about a firearm he allegedly owned. *Id*. Patane eventually admitted

to owning the firearm, it was seized from his home, and he was charged with firearms

offenses. *Id*. The High Court ultimately decided suppression of the firearm was not

warranted, declining to apply a fruits of the poisonous tree analysis to "mere failures to

give *Miranda* warnings[.]" *Id*. at 643. In doing so, the Court held:

> police do not violate a suspect's constitutional rights (or the *Miranda* rule)
> by negligent or even deliberate failures to provide the suspect with the full
> panoply of warnings prescribed by *Miranda*. Potential violations occur, if at
> all, only upon the admission of unwarned statements into evidence at trial.
> And, at that point, the exclusion of unwarned statements is a complete and
> sufficient remedy for any perceived *Miranda* violation.
>
> Thus, unlike unreasonable searches under the Fourth Amendment or actual
> violations of the Due Process Clause or the Self-Incrimination Clause, there
> is, with respect to mere failures to warn, nothing to deter. There is therefore
> no reason to apply the fruit of the poisonous tree doctrine[.]

*Id*. at 641-42 (internal quotations, citations, and ellipsis omitted). Put simply, the High

Court held the taking of an un-*Mirandized* statement results in the statement's exclusion

from evidence at trial, but there is no "deterrence-based argument" for suppressing the

fruits of that statement. *Id.* at 642-43. The Court further recognized, however, that "exclusion of the physical fruit of actually coerced statements" **was** required. *Id.* at 644.

The facts in this case are clearly distinguishable from the scenario at issue in *Patane.* Chief Wojciechowsky did not fail to advise appellee of his *Miranda* rights, but instead impermissibly induced him to speak in violation of his right to remain silent, after he had unambiguously invoked that right. This impermissible inducement rendered appellee's subsequent confession involuntary pursuant to our decision in *Commonwealth v. Gibbs*, 553 A.2d 409 (Pa. 1989).

In *Gibbs*, the defendant was arrested by state police investigating a murder. *Id.* at 409. Following a trooper advising him of his *Miranda* rights, Gibbs stated "Maybe I should talk to a lawyer. What good would it do me to tell you?" *Id.* The trooper responded, "I really don't know what good it would do. The only thing is I would tell the District Attorney you cooperated for whatever good that would be, but I would have no idea whether it would help your case or not." *Id.* Gibbs then made incriminating statements, which the trial court declined to suppress. *Id.* Gibbs was convicted of first-degree murder, sentenced to death, and this Court reversed the trial court's order denying suppression and granted Gibbs a new trial. *Id.* In doing so, the *Gibbs* Court stated the following:

> [W]e hold that the statement by the authorities to Griggs was an impermissible inducement and thereby tainted his admissions. By conveying the distinct impression that the district attorney would be told of his cooperation in giving a confession on the spot, there occurred an inescapable inducement which cannot be condoned under our law. For while we recognize that the police have a legitimate responsibility to conduct investigations, including interrogations, criminal suspects have a constitutional right to make up their own minds as to whether they want the *Miranda* protections. Promises of benefits or special considerations, however benign in intent, comprise the sort of persuasion and trickery which easily can mislead suspects into giving confessions. The process of rendering *Miranda* warnings should proceed freely without any intruding frustration by the police. Only in that fashion can we trust the validity of subsequent admissions, for if the initial employment of *Miranda* is exploited illegally, succeeding inculpatory declarations are compromised. Misleading statements and promises by the police choke off the legal process at the very moment which *Miranda* was designed to protect.

*Id.* at 410-411. *Compare with Templin*, 795 A.2d at 966 (confession not rendered involuntary where suspect waived *Miranda* rights and never attempted to invoke *Miranda* rights prior to inducement and confession).

From our holding in *Gibbs*, it follows logically that Chief Wojciechowsky coerced appellee into abandoning his right to remain silent which he had unambiguously and unequivocally invoked. Although Chief Wojciechowsky did not state he would attempt to get appellee favorable treatment with the district attorney, he nevertheless induced him into abandoning his right to remain silent by continuously stating he could only help appellee if he confessed prior to receiving the results of evidential testing from the lab, which Chief Wojciechowsky stated would prove that appellee was present at the crime scene. *See* Confession Transcript at 16-17. During this period of "impermissible inducement," *see Gibbs*, 553 A.2d at 410, Chief Wojciechowsky had another officer take appellee's shoes while Chief Wojciechowsky subsequently discussed with appellee the types of evidence that would be found on his shoes. *Id.* at 18-21. After more than twenty minutes of attempted inducements by Chief Wojciechowsky, appellee finally stated he wished to confess. *Id.* at 22. As appellee was impermissibly induced into speaking after he had invoked his right to remain silent, we hold the derivative physical evidence recovered as a result of his confession was properly suppressed.

Further, we make clear that, in circumstances where a suspect invokes his or her *Miranda* rights and an officer continues the interrogation, suppression of the statement alone is an inadequate remedy as it would allow officers to ignore a suspect's invocation in an attempt to secure physical evidence. The Supreme Court of New Hampshire has perfectly articulated this point:

> Prosecutors and police officers understand that the consequence of failing to abide by *Miranda* is the suppression of the defendant's statements. To allow the police the freedom to disregard the requirements of *Miranda* and thereby risk losing only the direct product of such action, but not the evidence derived from it, would not only not deter future *Miranda* violations

but might well tend to encourage them. An officer more concerned with the physical fruits of an unlawfully obtained confession than with the confession itself might reasonably decide that the benefits of securing admissible derivative evidence outweighed the loss of the statements.

*State v. Gravel*, 601 A.2d 678, 685 (N.H. 1991). We emphasize the Fifth Amendment's right against self-incrimination "demands that the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth" and "is fulfilled only when the person is guaranteed the right to remain silent unless he chooses to speak in the unfettered exercise of his own will." *Miranda*, 384 U.S. at 460 (internal citations omitted). Allowing the admission of derivative physical evidence under the circumstances present here would render meaningless the rights the Fifth Amendment is meant to protect.

## IV. Conclusion

Accordingly, we conclude the suppression court and the Superior Court correctly held that appellee clearly and unambiguously invoked his right to remain silent when he stated, "Yeah. I don't know just, I'm done talking. I don't have nothing to talk about." Furthermore, we find Chief Wojciechowsky impermissibly induced appellee to speak after he had invoked his right to remain silent, thus rendering his subsequent confession coerced and involuntary. As such, the derivative physical evidence recovered as a result of appellee's confession was also properly suppressed.

The order of the Superior Court is affirmed and the matter is remanded to the trial court for further proceedings.

Jurisdiction relinquished.

Justices Baer, Todd, Donohue, Wecht and Mundy join the opinion.

Chief Justice Saylor files a concurring opinion.