J-S16044-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JANAE HIGGS | : | No. 2415 EDA 2019 |

Appeal from the Order Entered August 5, 2019
in the Court of Common Pleas of Bucks County
Criminal Division at No(s):  CP-09-CR-0006946-2018

BEFORE:  DUBOW, J., McLAUGHLIN, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:                    **FILED MAY 19, 2020**

The Commonwealth of Pennsylvania appeals from the Order (the "Suppression Order") granting the pre-trial Motion to Suppress (the "Suppression Motion") filed by the defendant, Janae Higgs ("Higgs").[1]  The Commonwealth also has filed a Motion to Supplement the Record with the search warrant introduced into evidence during the suppression hearing.  We grant the Commonwealth's Motion to Supplement.  We affirm in part and reverse in part the Suppression Order, and remand for further proceedings.

---

[1] In accordance with Pa.R.A.P. 311(d), the Commonwealth certified that the Suppression Order has substantially handicapped its prosecution of the case. **See Commonwealth v. James**, 69 A.3d 180, 185 (Pa. 2013) (stating that the Commonwealth's appeal of a suppression order is proper when the Commonwealth certifies in good faith that the suppression order substantially handicaps its prosecution).

The suppression court summarized the factual history giving rise to the instant appeal as follows:

On June 22, 2018, U.S. Customs and Border Protection[] ("CBP") Officer DeSanto[2] examined DHL Package AWB No. 336917104 for examination due to its origin. The consignee was listed as Janae Higgs of 800 Trenton Road, Apartment 357, Langhorne, Pennsylvania 19047. After an investigation, the CBP officers determined that it contained two pill[-]press dies[,] designed to convert powder into small pills[,] whose markings imitated the markings of oxycodone. Pursuant to CBP's border[-]searching authority, the dies were seized and transported to Homeland Security Investigation's ("HSI") agents located in the Philadelphia International Airport[,] where the dies were then secured.

HSI Agent [Matthew] Blong [("Agent Blong")] contacted Pennsylvania State Police ("PSP") Trooper Jason Trupp [("Trooper Trupp")] with regard to the seized pill[-]press dies. It was determined [that] they would conduct a "knock and talk" contact with [Higgs] at the address where the seized dies were to be delivered. After a records check, it was confirmed [that Higgs] resided at the address of 800 Trenton Road, Apartment 357, Langhorne, Pennsylvania.

… [On June 26, 2018,] Trooper Trupp, Agent Blong and another fellow agent went to [Higgs's] residence and encountered a small female child at a partially opened window by the front door. The child advised the officers [that] only her mother was inside[,] and the officers requested to speak with her. After approximately ten minutes, [] Higgs answered the door.

Over the course of their conversation, [Higgs] kept the door cracked approximately six to twelve inches. [Higgs] eventually confirmed her identity and that she and her daughter resided at the residence. The officers explained to [Higgs] why they were there[,] and that pill[-]press dies[,] mailed in her name[,] were seized. [Higgs] agreed she was expecting a pill[-]press die in the mail[,] and claimed to manufacture her own vitamins as part of a holistic medicine business. The officers then requested to search

_____

[2] Officer DeSanto's full name was not available.

the residence[,] which [Higgs] refused to permit.  The officers told [Higgs that] they would seek to obtain a warrant, and in the meantime[,] they were going to secure the residence.  After attempting to close the door, [Higgs] was detained and put in handcuffs.

The officers then entered the home and searched the residence under their stated purpose of a "safety sweep" [(sometimes referred to as "protective sweep").]  In the course of their search[,] once inside [of] the residence, the officers claim to have followed the scent of marijuana to the second floor[,] where they located white powder, Ziplock bags, and other items indicative of the narcotics trade.  Four hours later, the Commonwealth sought a warrant to search the premises on the [A]ffidavit of Trooper Trupp[,] who attested to the foregoing facts.  That [A]ffidavit relied[,] in part[,] on the items found in the warrantless "safety sweep" search of the premises.

Suppression Court Opinion, 9/19/19, at 2-3 (footnote added).  The officers executed the search warrant, and seized physical evidence as a result of that search.

On June 26, 2018, Higgs was arrested and charged with possession with intent to deliver a controlled substance and criminal conspiracy,[3] as well as other related charges.  On April 24, 2019, Higgs filed the Suppression Motion to suppress her statements to law enforcement, the physical evidence seized during the protective sweep, and the physical evidence seized as a result of the execution of the search warrant.  After a hearing, the suppression court granted the Suppression Motion as to the physical evidence obtained during the protective sweep of the residence and the execution of the search warrant.

---

[3] *See* 35 P.S. § 780-113(a)(30); 18 Pa.C.S.A. § 903.

Suppression Order, 8/5/19. The suppression court also suppressed Higgs's statements following her detention, and during the protective sweep and search of her residence. *See id.* The Commonwealth filed a Motion for Reconsideration, which the suppression court denied. Thereafter, the Commonwealth timely filed a Notice of Appeal, and a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

The Commonwealth presents the following claims for our review:

A. Did the [suppression] court err and/or misapply the law by issuing a subsequent written Order granting suppression of **all** of [Higgs's] statements, which Order also stated[,] "[*s*]**ee** Findings of Fact and Conclusions of Law Placed on the Record," where [Higgs's] statements were not the fruits of the poisonous tree, where the court, in open court and on the record[,] had already denied [Higgs's] Motion to Suppress statements, and/or where [Higgs] did not state on the record with specificity any intent to seek suppression of statements at the suppression hearing, or any grounds therefor, and therefore[,] no testimony or evidence was presented by either party on that issue?

B. Did the trial court err and/or misapply the law in finding that the initial protective sweep of [Higgs's] residence by law enforcement officers was an unlawful "search[,]" where the facts, known by the officers at that time, supported that the protective sweep was based on valid exigent circumstances to prevent the destruction of evidence and secure the residence for the purpose of obtaining a search warrant[,] which was secured and executed that same date?

C. Did the trial court err by misstating the facts and/or in finding facts wholly without support of record, and then relying on [the] same in rendering its rulings, specifically in connection to the actual date of the protective sweep of [Higgs's] residence[,] and the securing and executing of the search warrant at that residence, all of which occurred on June 26, 2018?

D. Did the trial court err and/or misapply the law in granting suppression of all physical evidence from [Higgs's] residence that was seized by police pursuant to a valid search warrant, where sufficient probable cause existed within the four corners of the warrant to conduct the search, even with the redaction of any facts in connection to police observations during the protective sweep, and where the court did not address or make specific findings as to whether probable cause existed for the search warrant on the record or in its subsequent Orders, as it was required to do?

Commonwealth's Brief at 4-5 (issues renumbered, most capitalization omitted, emphasis added).

When reviewing an order suppressing evidence, we consider "only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the suppression hearing as a whole." *Commonwealth v. Lukach*, 195 A.3d 176, 183 (Pa. 2018) (citation omitted). "Where the record supports the suppression court's factual findings, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error." *Id.* (citation omitted).

The Commonwealth first argues that the suppression court, in its written Suppression Order, improperly suppressed all of Higgs's statements to the officers. Commonwealth's Brief at 15. According to the Commonwealth, the suppression court's on-the-record Findings and Conclusions ruled that Higgs's "statements to the officers are not suppressed[,] as she was not under arrest at that time." *Id.* (citation omitted, emphasis added). Notwithstanding, the written Suppression Order required the suppression of **all** of Higgs's statements. *Id.* The Commonwealth further directs our attention to the

- 5 -

suppression court's written Opinion, wherein the court ruled that Higgs's statements to authorities, before she was detained and before the protective sweep, are not suppressed. *Id.* at 16. According to the Commonwealth, these inconsistencies are raised on appeal because of the Commonwealth's concern that the written Suppression Order controls over the suppression court's statement on the record and the written Opinion. *Id.*

Our review of the record discloses that in her Suppression Motion, Higgs averred the following:

> 7. [Higgs] made statements **subsequent to the illegal arrest**[,] which the Commonwealth seeks to introduce at trial. Those statements should be excluded as fruit of the poisonous tree.
>
> ….
>
> 9. The seized controlled substances, drug paraphernalia and **subsequent statements** made are the results of an illegal search and seizure of [Higgs] and the residence.
>
> WHEREFORE, [Higgs] requests this Honorable Court grant [Higgs's] Motion to Suppress the illegally obtained evidence.

Suppression Motion, 4/24/19, at 1-2 (unnumbered) (emphasis added).

At the conclusion of the suppression hearing, the suppression court orally pronounced its Findings and Conclusions, stating, in relevant part, as follows:

[**THE SUPPRESSION COURT**:]

- 6 -

1[. N]o exigent circumstances existed to conduct a safety search, as in the **Johnson** case,[4] which the [suppression] [c]ourt does not find analogous;

2[. T]he officers were not authorized, under Pennsylvania law, to force their way into the residence without a search warrant;

3[. A]ll evidence of household contents found are excluded and suppressed, as well as the fruit of the poisonous tree;

4[. Higgs's] statements to the officers are not suppressed[,] as she was not under arrest at that time.

….

[**The Commonwealth**]: Judge, it's my understanding, now that the entire search warrant of the residence is suppressed and the evidence within the residence—is that the Court's ruling?

THE COURT: From within the residence; **however, [Higgs's] statements to the officers while she's talking to them may come in.**

N.T. (Suppression), 8/5/19, at 54-55 (footnote and emphasis added).

In its written Suppression Order, the suppression court stated as follows, in relevant part:

[U]pon consideration of [Higgs's] Motion, it is hereby ORDERED that **all the evidence and statements seized/obtained from [Higgs] [are] hereby SUPPRESSED**, as it is the result of an unlawful search, and shall not be received or admitted into evidence. **See** Findings of Fact and Conclusion of Law placed on the record.

---

4 **See Commonwealth v. Johnson**, 68 A.3d 930 (Pa. Super. 2013).

Suppression Court Order, 8/5/19 (emphasis added). Finally, in its September 19, 2019, Opinion, the suppression court clarified its written Suppression Order as follows:

> To clarify, the [suppression c]ourt's August 5, 2019[,] Order did not suppress all statements [Higgs] made on June 26, 2019. As directed, the [c]ourt's [F]indings of [F]act and [C]onclusions of [L]aw[,] outlined in the record[,] state that any statements [Higgs] made before she was detained and the officers conducted a protective sweep were not suppressed[,] as she was not under arrest at that time.

Suppression Court Opinion, 9/19/19, at 6.

Thus, the contents of Higgs's Suppression Motion and the suppression court's subsequent August 5, 2019, Order, as clarified by its Findings and Conclusions stated on the record and the September 19, 2019, Opinion, reflect that Higgs's statements **prior** to her detention and the protective sweep are not subject to suppression. To the extent that the written Order states that *all* of Higgs's statements are suppressed, the Suppression Order is reversed.

In its second claim, the Commonwealth argues that the suppression court improperly concluded that the initial protective sweep of the residence constituted an unlawful search unsupported by exigent circumstances.[5]

_____

[5] Additionally, the Commonwealth argues that, in its Findings and Conclusions, the suppression court failed to consider whether probable cause existed to support the warrantless search, as is required in considering the totality of the circumstances. Commonwealth's Brief at 33. However, absent consent or exigent circumstances, private homes may not be constitutionally entered to conduct a search or to effectuate an arrest without a warrant, even where probable cause exists. **Commonwealth v. Santiago**, 736 A.2d 624, 631 (Pa. Super. 1999).

Commonwealth's Brief at 22. Specifically, the Commonwealth argues that probable cause and exigent circumstances existed to support the warrantless search. *Id.*

Both the United States Constitution and the Pennsylvania Constitution guarantee that individuals shall not be subject to unreasonable searches or seizures. The United States Constitution provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Similarly, the Pennsylvania Constitution provides that

> [t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const., Art. I, § 8. "Evidence obtained as a result of an unlawful search is subject to the fruit of the poisonous tree doctrine. The United States Supreme Court has stated that any material, tangible, or verbal evidence 'obtained either during or as a direct result of an unlawful invasion' is inadmissible at trial." *Commonwealth v. Chesney*, 196 A.3d 253, 258 (Pa. Super. 2018) (quoting *Wong Sun v. United States*, 371 U.S. 471, 485 (1963)).

Our Supreme Court has explained that "[a]bsent probable cause and exigent circumstances, the entry of a home without a warrant is prohibited under the Fourth Amendment."[6] ***Commonwealth v. Roland***, 637 A.2d 269, 270 (Pa. 1994).

> Our Supreme Court has equated the term "exigent circumstances" with "urgent need" to underscore the "heavy burden" on the Commonwealth to prove that prompt police action was imperative. **The Commonwealth must show by clear and convincing evidence that the circumstances surrounding the opportunity to search were truly exigent.** Whether circumstances exist depends on an examination of all of the surrounding circumstances in a particular case.
>
> Additionally, police cannot rely upon exigent circumstances to justify a warrantless entry where the exigency derives from their own actions.

***Commonwealth v. Duke***, 208 A.3d 465, 470 (Pa. Super. 2019) (emphasis added, citations and some internal quotation marks omitted).

In determining whether exigent circumstances exist, the following factors are to be considered:

> [(1)] [T]he gravity of the offense, (2) whether the suspect is reasonably believed to be armed, (3) whether there is above and beyond a clear showing of probable cause, (4) whether there is strong reason to believe that the suspect is within the premises being entered, (5) whether there is a likelihood that the suspect will escape if not swiftly apprehended, (6) whether the entry was peaceable, and (7) the time of the entry, *i.e.*, whether it was made at night. These factors are to be balanced against one another in determining whether the warrantless intrusion was justified.

---

[6] "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" ***Welsh v. Wisconsin***, 466 U.S. 740, 748 (1984) (citation omitted).

*Id.* at 270-71 (quoting *Commonwealth v. Wagner*, 406 A.2d 1026, 1031 (Pa. 1979)); *accord Commonwealth v. Gray*, 211 A.3d 1253, 1261 (Pa. Super. 2019). "Other factors may also be taken into account, such as whether there is … a likelihood that evidence will be destroyed if police take the time to obtain a warrant, or a danger to police or other persons inside or outside the dwelling." *Commonwealth v. Ford*, 175 A.3d 985, 990 (Pa. Super. 2017) (citation omitted). In making this determination, we consider the totality of the circumstances "as seen through the eyes of the trained officer." *Gray*, 211 A.3d at 1261 (citation omitted).

The Commonwealth argues that, in considering the gravity of the offense,

> it is reasonable to conclude that such pills were being manufactured with the intent to deliver them to persons who took no part in their manufacture. Narcotic drugs, when served in powder form, would appear to have been manufactured obviously illicitly, and a potential user would not consider the drug to be as valuable as the pharmaceutical pill form[,] because of potential contamination, low potency, inability to properly measure an appropriate dosage, and the lack of regulatory controls over illicitly-made drugs. On the other hand, it is reasonable to conclude that known narcotic drugs are served in pill format, bearing the trademarked insignia of a pharmaceutical company, a user would believe that the drug was legally manufactured under strict controls by a legitimate entity, with known content and purity, and therefore value the drug higher than powder form. Therefore, a user would reasonably pay more for inscribed pill form narcotics, and the business of selling those drugs would prove to be more lucrative. The fact that such activities were being conducted in the presence of a small child serves to heighten the gravity of the offenses.

Commonwealth's Brief 35-36. The Commonwealth, however, does not include citations to any testimony or evidence, presented at the evidentiary hearing, that support these assertions.

The Commonwealth also argues that the suppression court erred in focusing on only two of the above factors in finding that a lack of exigent circumstances existed. *Id.* at 42. Regarding the remaining factors, the Commonwealth points out that the knock-and-talk encounter took place at 11:15 a.m.; Higgs's young daughter was present, and presumably more willing to follow her mother's direction than an unrelated person of similar or greater age, in light of the fact that Higgs had been told a search was imminent; there was a likelihood that evidence would be destroyed if the inside of the premises was not secured while a warrant was sought; the length of time that Higgs took to arrive at the door after being informed of the presence of law enforcement; Higgs first went to the bathroom, before arriving at the door; and the bathroom is the typical location for removing the presence of powders or vent the smoke from burning objects.[7] *Id.* at 37-38. The Commonwealth posits that Higgs showed a consciousness of guilt when she opened the door only "a small bit," and that she confirmed officers' suspicions by "giving unusual answers to simple questions[.]" *Id.* at 38-39.

---

[7] The Commonwealth presented no testimony or evidence that supported this assumption.

According to the Commonwealth, the suppression court also failed to consider the likelihood that evidence would be destroyed if police took the time to secure a warrant, and the danger to police or other persons inside of the dwelling, which required swift action. *Id.* at 40 (citing *Commonwealth v. Dean*, 940 A.2d 514, 522 (Pa. Super. 2008)). The Commonwealth emphasizes the danger to a small child living inside of the residence. *Id.* at 39. According to the Commonwealth, it is reasonable to presume that Higgs was intending to press powerful powdered painkilling drugs into pills and, because the powder is dispersible and susceptible to become airborne and inhaled, police were justified in fearing for the safety of Higgs's daughter. *Id.* The Commonwealth cites no evidence at the hearing that would support these presumptions.

We begin our analysis with the proposition that once Higgs refused consent to search her home, the officers violated Higgs's Fourth Amendment rights when they nevertheless entered and searched her home. *See Commonwealth v. Bowmaster*, 101 A.3d 789, 792 (Pa. Super. 2014) (recognizing that upon entering the appellant's home and searching his property without a warrant, the troopers were violating the appellant's Fourth Amendment rights).

At the evidentiary hearing, the Commonwealth stated that it would "present no testimony; it's simply a 'four corners of the warrant' argument."

N.T., 8/5/19, at 11; *see also id.* at 12 (wherein the prosecutor "rested," for the purpose of the Suppression Motion).

In support of her Suppression Motion, Higgs presented the testimony of Agent Blong, the affiant of the search warrant and an agent with CBP. *Id.* at 12, 19. Agent Blong testified that on June 22, 2018,[8] law enforcement officials conducted a "knock-and-talk" encounter at Higgs's apartment complex in Bucks County. *Id.* at 13. Agent Blong explained that he conducts, *inter alia*, narcotics investigations. *Id.* at 20. The "knock-and-talk" encounter arose because of the recovery of a package, seized by the United States Department of Homeland Security, and addressed to Higgs. *Id.* at 13. Agent Blong acknowledged that he had no warrant to search Higgs's residence when he conducted the "knock-and-talk." *Id.* at 14. Agent Blong testified that throughout the investigation, he was in contact with Trooper Trupp, who was seated in the courtroom. *Id.* at 20-21. Agent Blong confirmed that if he discovered anything "suspicious" about the package, he would have relayed that information to Trooper Trupp. *Id.* at 21. However, when asked what was suspicious about the package, the following discussion transpired:

> **[Defense Counsel]:** Objection, Your Honor. Again, this is beyond the scope. The Commonwealth chose not to call this witness, and now they're on cross-examination. It's limited to what I asked on direct.
>
> **THE COURT:** Your response?

---

[8] The "knock-and-talk" encounter actually took place on June 26, 2018.

[**The Commonwealth**]: I thought it may be helpful for the [c]ourt to hear more of a full picture, just limited leeway. But if the [c]ourt sustains the objection, I understand; I'll stop this line of questioning.

**THE COURT:** I'll sustain it.

N.T. (Suppression), 8/5/19, at 22. Trooper Trupp was not called as a witness. Thus, no witness testified regarding the suspicious nature of the package.

The record further discloses that, upon arriving at Higgs's residence, Agent Blong knocked on the door. *Id.* at 13-14. At that time, Higgs's young daughter spoke to the officials through the crack of an open window. *Id.* at 14. Agent Blong testified that at least five minutes transpired between his conversation with the young girl, and his conversation with Higgs. *Id.* When Higgs arrived at the door, she opened it only a crack to speak with Agent Blong. *Id.* At some point in time, Higgs refused to consent to a search of her residence. *Id.* According to Agent Blong, the officers then placed Higgs in handcuffs. *Id.* at 16. Higgs was not free to leave once she was placed in handcuffs. *Id.* at 17. During re-direct examination, Agent Blong testified that the Department of Homeland Security conducted no surveillance activities prior to the "knock-and-talk" of Higgs's residence. *Id.* at 23.

In its Opinion, the suppression court determined that there were no exigent circumstances supporting the warrantless search of Higgs's home:

> The officers admitted to speaking with [Higgs's] daughter upon arrival[,] and the child identifying only her mother inside the residence. Approximately ten minutes later, [Higgs] arrived at the door and advised the officers [that] she resided at the home with her daughter. At this point, the officers had no inclination to

- 15 -

> believe any additional persons were inside the home capable of destroying evidence. Nor was there testimony of other voices or activity in the apartment while they spoke with [Higgs] or her daughter. The officers did not identify seeing anyone else at the residence, did not detect any sounds coming [from] within the home that would suggest others were inside, nor did the officers inquire whether there were any other individuals inside. Further, the Commonwealth did not assert, and no evidence was presented to the [c]ourt, that any of the officers were concerned for their personal safety.

Suppression Court Opinion, 9/19/19, at 5.

Mindful of the Commonwealth's heavy burden in proving exigent circumstances, we agree with the suppression court that the Commonwealth failed to meet this burden. The limited evidence presented at the suppression hearing shows that, prior to the protective sweep, Agent Blong seized a suspicious package addressed to Higgs. There was no surveillance conducted on the house prior to the officers' arrival indicating the presence of other persons besides Higgs and her daughter. With Higgs restrained, there was no evidence that would support a belief that evidence would be destroyed if officers waited to obtain a search warrant. Although the gravity of the offense would weigh in the Commonwealth's favor, there is no evidence regarding potential danger to persons inside of the residence, in the event that officers did not immediately enter the premises. Consequently, the suppression court properly granted suppression of the evidence and statements seized during the protective sweep. We therefore cannot grant the Commonwealth relief on this claim.

In its third claim, the Commonwealth argues that in granting Higgs's Suppression Motion, the suppression court erred when it rendered findings regarding relevant dates "wholly without support [in] the record[.]" Commonwealth's Brief at 20 (capitalization omitted). According to the Commonwealth, the suppression court erroneously found that the "knock-and-talk" encounter and protective sweep occurred on June 22, 2018. *Id.* Based upon that date, the suppression court determined that the Commonwealth waited four days before securing a search warrant, which relied on items found during the safety sweep. *Id.* at 21 (citations omitted). The Commonwealth asserts that, based on the search warrant affidavit, "June 26, 2018[,] was the sole date that law enforcement conducted the 'knock-and-talk' [encounter], the protective sweep, and the execution of the search warrant." *Id.* Because the suppression court improperly relied upon the erroneous date, June 22, 2018, in suppressing evidence, the Commonwealth seeks to reverse suppression of the evidence seized pursuant to the search warrant. *Id.* at 22.

Our review of the record discloses that at the suppression hearing, Agent Blong mistakenly testified that law enforcement officers conducted the protective sweep of Higgs's residence on June 22, 2018. N.T. (Suppression), 8/5/19, at 13. In its Decision and Order entered on August 15, 2019, the suppression court found that officers conducted the protective sweep on June 22, 2018, and did not seek a search warrant until June 26, 2018. Decision

- 17 -

and Order, 8/15/10, at 1-2. However, in its September 19, 2019, Opinion, the suppression court corrected this error:

> In the prior Decision and Order entered on August 15, 2019, [the suppression court] stated that the protective sweep was conducted on June 22, 2018. The [c]ourt corrects the prior erroneous date and finds [that] the sweep did[,] in fact[,] occur on June 26, 2018[,] when the "knock[-]and[-]talk" visit occurred….

Suppression Court Opinion, 9/19/19, at 2. Notwithstanding the correction in date, the suppression court determined that the Commonwealth failed to establish exigent circumstances justifying the warrantless intrusion into Higgs's residence. *See id.* at 5. We conclude that the suppression court's error in the date, standing alone, does not warrant reversal of its Suppression Order. Rather, we consider the suppression court's date error in conjunction with the Commonwealth's fourth claim, *i.e.*, that the suppression court improperly suppressed the evidence seized pursuant to execution of the search warrant.

In its fourth claim, the Commonwealth argues that the suppression court improperly suppressed all physical evidence seized during the subsequent execution of the search warrant. Commonwealth's Brief at 45. The Commonwealth argues that sufficient probable cause existed within the four corners of the search warrant, even if the facts obtained through police observations during the protective sweep are redacted. *Id.* The Commonwealth disputes the suppression court's rationale for suppressing all evidence as "wholly inadequate[,] as it failed to actually address and, in fact,

- 18 -

ignored the totality of the circumstances, and all reasonable inferences that arose therefrom." *Id.* at 47.

A search warrant must be supported by probable cause. U.S. Cont. amend. IV; Pa.Const. art. I, § 8. "Probable cause exists where the facts and circumstances within the affiant's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that a search should be conducted." ***Commonwealth v. Jones***, 988 A.2d 649, 655 (Pa. 2010) (citation omitted). As our Supreme Court has observed,

> [i]n ***Illinois v. Gates***, 462 U.S. 213, … (1983), the United States Supreme Court established the "totality of the circumstances" test for determining whether a request for a search warrant under the Fourth Amendment is supported by probable cause. In ***Commonwealth v. Gray*** []503 A.2d 921 … ([Pa.] 1986), [the Pennsylvania Supreme] Court adopted the totality of the circumstances test for purposes of making and reviewing probable cause determinations under Article I, Section 8. In describing this test, [our Supreme Court] stated:

>> Pursuant to the "totality of the circumstances" test set forth by the United States Supreme Court in ***Gates***, the task of an issuing authority is simply to make a practical, common-sense decision whether, given all of the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place …. It is the duty of a court reviewing an issuing authority's probable cause determination to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In so doing, the reviewing court must accord deference to the issuing authority's probable cause determination, and must view the information offered to establish probable cause in a common-sense, non-technical manner.

*     *     *

> [Further,] a reviewing court [is] not to conduct a *de novo* review of the issuing authority's probable cause determination, but [is] simply to determine whether or not there is substantial evidence in the record supporting the decision to issue the warrant.
>
> ***Id.*** (quoting ***Commonwealth v. Torres***, … 764 A.2d 532, 537-38, 540 (Pa. 2001)) (some alterations in original).

***Commonwealth v. Torres***, 177 A.3d. 263, 269-70 (Pa. Super. 2017).

Here, the suppression court concluded that the search warrant was not supported by probable cause. Suppression Court Opinion, 9/19/19, at 6. Upon our review of the search warrant, and the Affidavit of Probable Cause included therein, we disagree.[9]

In his Affidavit of Probable Cause Trooper Trupp averred, in part, as follows:

> On 6/22/18, [CBP] Officer DeSant[o] was condu[c]ting enforcement operations at DHL shipping[,] located in Philadelphia, PA, [and] targeted DHL package AWB[ ]# 3369171304 for examination due to its origination in Shanghai, China[,] and transit through Dubai, UAE. Shanghai, China is a major exporter of fentanyl to the U.S. and shippers are known to trans-ship to avoid detection. Additionally, it was declared as "Drills Bit Sample[,]" which was inconsistent with the feel of the package. The shipper was identified as "Shanghai Hongna Trading Co[.] Ltd[.]"[;] however, the parcel was exported through "Nice Express, CMC Office Fg2, Dubai Airport Freezone, UAE." The consignee was listed as Janae Higgs of 800 Trenton Road, Apt 357,

---

[9] "In deciding whether a warrant issued in part upon information obtained through exploitation of illegal police conduct is valid, we must consider whether, absent the information obtained through the illegal activity, probable cause existed to issue the warrant." ***Commonwealth v. Shaw***, 383 A.2d 496, 502 (Pa. 1978).

Langhorne, PA 19047. Telephone number 215 839 4598 was listed on the label. The shipment had a small cardboard box, which contained two pill press dye [*sic*]. This search was conducted subsequent to CBP's border searching authority. The dye [*sic*] were designed to mold oval tablets with the imprint of "M523" and "10/352," which corresponds to oxycodone pills, which is a trademarked symbol. The dye [*sic*] were seized and sealed in evidence bag #A5264656, B.E.S.T.-CBP[] POUNDS was advised of the seizure and the pill dye [*sic*] were transported to [HSI] Agents[,] who were located in the Philadelphia International Airport, where the dyes [*sic*] were secured in an evidence locker.

On 6/22/18, [Agent Blong] … contacted your affiant in regards to the seized pill dye [*sic*]. It was determined that a ["]knock[-]and[-]talk["] would be conducted at the address where the seized dye [*sic*] were to be delivered. A records check was then conducted on the consignee listed on the parcel's label, Janae Higgs. It was found that a Janae Higgs, DOB 10/24/86, was listed as residing at the address of 800 Trenton Road, Apt. 357.

On 6/26/18, at approximately 1115 hrs, [Agent] Blong, S/A Kimberly Caraway and myself conducted a ["]knock[-]and[-]talk["] at the residence where the parcel was intended to be delivered, which was 800 Trenton Road, Apt 357 – Langhorne, PA, which is located in Middletown Twp[.], Bucks County. This residence appeared to be a two story, apartment home, with a brick and tan siding façade. There are four separate windows on the front of the residence, along with a white door bearing the numeric[] 357. Upon knocking and ringing the doorbell, a small female child came to a partially opened window by the front door, and advised that her mother was inside. We advised the child to get her mother whom we wished to speak with. The child left and then came back, advising her mother was now in the bathroom. Eventually, after approximately ten or more minutes, a female, who eventually was identified as [] Higgs, opened the front door. Agents and your affiant identified ourselves, and advised Higgs that we would like to speak with her. Higgs kept the door cracked approximately six to twelve inches while talking to agents and your affiant. Higgs initially would not identify herself, and did not wish to open the door or come outside to talk.

Higgs then asked why we were there at the residence. Higgs was asked if she resided at this apartment, and just like identifying herself, would not initially give a clear and concise answer. Higgs

eventually admitted that this was her residence, and that she resided there with her daughter. Higgs was then asked if she was expecting any shipments in the mail. Higgs advised that she received things in the mail all the time because she orders things online. Higgs was then asked if she received shipments from overseas from places such as China. Higgs advised that she has, again stating she orders things online.

Higgs was then presented with the pill dye [*sic*] and was advised that it what [*sic*] was seized and why we were at her residence. Higgs was able to discern what exactly the pills dye [*sic*] was. Higgs then began stating that she has Lupus and is in[to] holistic medicine. Higgs then related that she often makes her own vitamins. Higgs was then asked how she makes her own "vitamins," and she related with different things like vitamin B, and other powders, then presses them into a pill. She advised that she was using her "friend's" pill dye [*sic*] to press her own vitamins, but recently grew tired of borrowing one. Higgs related that she had given her "friend" approximately $100 or more to order a pill dye [*sic*] so that she could have her own, admitting that she was expecting a pill dye [*sic*] in the mail.

Based on the totality of the circumstances, Higgs was requested consent to search the residence. Higgs related that she would not let anyone in her residence or to search. Higgs was taken into custody for possession of the pill dye [*sic*]. Higgs was then explained that the house would be secured[,] and a search warrant would be obtained for the residence. Higgs was advised that a search warrant was going to be obtained and the house was now going to be secured, at which point she attempted to close the door.

Affidavit of Probable Cause, 6/26/18, at 2-3.

Thus, the Affidavit of Probable cause indicated that a pill die, designed to imprint pills with identifying trademark information for oxycodone, a controlled substance, without authorization to use that trademark, was in a package addressed to Higgs at her residence. Prior to being restrained by officers, Higgs admitted to ordering the pill dies, and using them to make

herbal vitamins and remedies. The possession of a pill die, designed to imprint the identifying information for trademarked oxycodone, implicates several offenses. The Controlled Substance, Drug, Device and Cosmetic Act prohibits the

> keeping in possession, control or custody, … any punch, **die**, plate, stone or other thing designed to print, imprint or reproduce the trademark, trade name or other identifying mark, imprint or symbol of another or any likeness of any of the foregoing upon any controlled substance, other drug, device or cosmetic or container thereof.

35 P.S. § 780-113(a)(9). Further, the Act prohibits

> [t]he intentional … possessing of any … die … designed to print, imprint, or reproduce the trademark, trade name, or other identifying mark, imprint, or symbol of another or any likeness of any of the foregoing upon any drug or container or labeling thereof so as to render the drug a counterfeit substance.

*Id.* § 780-113(a)(29). The Act prohibits the possession with intent to deliver a counterfeit controlled substance. *Id.* § 780-113(a)(30). Further, the delivery of the pill die to Higgs implicates 63 P.S. § 390-8(2), regarding the engaging in the unlicensed practice of pharmacy, including the preparing, compounding, and/or dispensing of any drug.

Under the totality of the circumstances, the officers had probable cause to believe that evidence of violations of the above statutes, *i.e.*, the materials to be inserted into the pill dies and packaging, would be found within Higgs's residence. Thus, the suppression court erred in granting suppression of the physical evidence seized as a result of the execution of the search warrant. We therefore reverse the Suppression Order only as it pertains to the

suppression of the physical evidence seized during the execution of the search warrant.

Motion to Supplement the Record granted. Suppression Order affirmed in part and reversed in part, consistent with this Memorandum. Case remanded for further proceedings. Superior Court jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/19/2020