J-S18021-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL GEORGE HARRIS, JR. | : | |
| | : | |
| Appellant | : | No. 105 MDA 2022 |

Appeal from the Judgment of Sentence Entered September 14, 2021
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s): CP-41-CR-0001125-2019

BEFORE: BENDER, P.J.E., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY McLAUGHLIN, J.:      **FILED: SEPTEMBER 21, 2022**

Michael George Harris, Jr. appeals the judgment of sentence entered after a jury convicted him of numerous sex crimes: rape of a child, statutory sexual assault, involuntary deviate sexual intercourse, criminal attempt, aggravated indecent assault of child, aggravated indecent assault - victim less than 16 years old, indecent assault, indecent assault – victim less than 13 years old, indecent assault – victim less than 16 years old, endangering welfare of children, corruption of minors, and indecent exposure.[1] He challenges the admission of evidence at trial and the discretionary aspects of his sentence. We affirm.

---

[1] 18 Pa.C.S.A. §§ 3121(c), 3122.1(b), 3123(a)(7), 901(a), 3125(b), 3125(a)(8), 3126(a)(1), 3126(a)(7), 3126(a)(8), 4304(a)(1), 6301(a)(1)(ii), and 3127(a), respectively.

Police received information in May 2019 from Facebook, Inc., that Harris was messaging two separate Facebook accounts about sex acts with his 10-year-old stepdaughter, P.C. Following an interview with P.C. and her eventual relay of information regarding Harris's abuse, police arrested and charged Harris.

Before trial, the Commonwealth filed a notice of intent to introduce bad acts evidence pursuant to Rule 404(b) of the Pennsylvania Rules of Evidence. It stated that it wished to introduce the Facebook messages between Harris and a 14-year-old white female, A.W. **See** Notice of Intent to Introduce Evidence Pursuant to Rule 404(b) ("Notice"), at 2 (unpaginated). It also stated that it wished to introduce Facebook messages between Harris and an adult female, R.W.[2]

In his conversation with A.W., Harris told her that another victim with a first name beginning with "P" did not get pregnant despite "years of not pulling out." **Id.** In his conversation with R.W, Harris told the woman that he began having sex with his stepdaughter when she was 10 years old. He suggested to R.W. that they should have a child together and then engage in a threesome with the child.

Upon being interviewed, A.W. explained that Harris began having sexual intercourse with her when she was in the eighth grade. She also stated that Harris was her father's friend and lived next door. She detailed that his

---

[2] The messages were not included in the certified record.

assaults began with him touching her vaginal area and escalated to intercourse. She stated that he never used a condom and that he told her not to tell anyone about their interactions and to keep it a secret.

The Commonwealth's Rule 404(b) notice stated that P.C., the victim in the instant case, is a white female, who at the time of the filing of the complaint was 14 years of age. It stated that Harris began his sexual assault of P.C. when she was 11 or 12 years old. Harris was married to P.C.'s mother at the time and lived in the home. Harris's assault of P.C. began with touching her breasts, progressed to digital penetration of her vagina, and eventually escalated to sexual intercourse. Harris told P.C. that her mother knew about what he was doing and that she should not tell her because she did not care.

The Commonwealth also noted that Harris had been found guilty of statutory sexual assault and corruption of minors in Bradford County for his acts against N.W., a 14-year-old victim. N.W. is also a white female. N.W. stated that Harris never used a condom when he had sexual intercourse with her and that he was living with her mother during the time of the assaults. He also told N.W. not to tell anyone what was happening.

The Commonwealth contended that the sexual relationships between Harris and N.W and A.W were admissible in the instant case. It argued that the crimes against each victim including P.C. were similar. It noted that all the victims were white females under the age of 15, they all lived on the same property as Harris, Harris gained access to each of the victims through their parent or guardian, he engaged in sexual and deviate sexual intercourse with

the victims and did not use a condom. It also noted that in each case, Harris told the victims not to tell anyone.

The Commonwealth maintained that the conversations between A.W. and Harris were admissible because they "are part of a chain or sequence of events that form the history of this case and are part of its natural development." *See* Notice, at 4 (unpaginated). It noted that charges were only filed in the instant case because of the discovered conversation between A.W. and Harris that made references to his sexual contact with P.C. It argued that Harris tried to convince A.W. that it was safe to continue to have sex with him without a condom because he did the same with P.C. and he never impregnated her. It also argued that the messages were admissible as proof of consciousness of guilt. It stated that Harris had sent A.W. messages on five separate occasions, telling her to delete their messages. The Commonwealth also maintained that the evidence was necessary to rebut Harris's claim that his conversations with A.W. about sex with her and with P.C was just "talk."

Before trial, Harris moved to suppress statements he made when police interviewed him. *See* Omnibus Pre-Trial Motion, filed 6/22/20.[3] Harris stated that he made statements to Trooper Jamesan Keeler but that they should be suppressed because they were involuntary. He argued that he made an unambiguous request for counsel, but Trooper Keeler continued speaking with

_____

[3] Harris also asked the court to sever charges relating to his alleged sexual interactions with a dog and sexual assault of P.C.'s mother.

him. Harris also argued that any prior bad acts involving minors should be excluded.

At a hearing on the motion, Trooper Keeler testified that when he interviewed Harris, he read Harris his *Miranda* warnings and that Harris signed a waiver form. *See* N.T., Omnibus Pre-Trial Motion, 9/24/20, at 6, 8, 10.[4] The Commonwealth introduced a video of the interview as well as a transcript of the interview. *Id.* at 8. The Commonwealth played the entirety of the video for the court. *Id.* at 10. Trooper Keeler testified that when Harris referenced counsel, he continued questioning him because "I wanted him to be specific on what he meant by that remark." *Id.* at 18. The Commonwealth also admitted Harris's criminal history rap sheet to show his familiarity with the criminal justice system. *Id.* at 20. Harris testified that he signed an application for a public defender before being interviewed by Trooper Keeler. *Id.* at 24-25.

Following the hearing, the court ordered both parties to submit briefs for their respective arguments. In his brief, Harris argued that in the following exchange between him and Trooper Keeler, he invoked his right to counsel.

> **Harris**: And before we get started with anything, I'm not planning to be mean or nothing, but I probably will lawyer up.
>
> **Trooper Keeler**: Okay. And that's -  that's
>
> **Harris**: I'm not being a dick or nothing, but with the charges and everything, I think it would be the best bet to –

---

[4] *Miranda v. Arizona*, 384 U.S. 436 (1966).

> **Trooper Keeler**: Okay. Because once you – once you lawyer up, basically I'm probably never – you'll never talk to me.
>
> **Harris**: Okay.
>
> **Trooper Keeler**: But that's your – that's your right as, you know, you have, so if that's
>
> **Harris**: Well, let's keep going to see –
>
> **Trooper Keeler**: Okay
>
> **Harris**: Because I want to know everything that is going on.
>
> **Trooper Keeler**: Okay. So you wanna keep talking? You don't want an attorney?
>
> **Harris**: Well, eventually, yes, I do.

Brief in Support of Omnibus Pretrial Motion, filed 10/19/20, at 2-3 (unpaginated) (quoting Harris Interview Transcript, 7/9/19, at 3-4). Later in the interview, Harris stated, "This is where the lawyer – like – I'm not – I don't want to spend the rest of my life in prison." *Id.* at 3 (quoting Harris Transcript, at 19-20).

Harris argued that the interview with Trooper Keeler should have ceased at the point he stated he would eventually get a lawyer. Harris also argued that his statements should be suppressed because his right to counsel attached at the time that he signed his application for a public defender. He further argued that Trooper Keeler explained the *Miranda* rights in a confusing and manipulative way. For its part, the Commonwealth argued that Harris waived his right to counsel when he signed the *Miranda* waiver form and that the four references he made to counsel were "hypothetical,

ambiguous, and/or equivocal." Brief in Opposition to Defendant's Omnibus Motion, filed 10/26/20, at 6.

The trial court denied the motion.[5] Upon reviewing the interview video, the court noted that Harris stated that he was "familiar with the process," and that he continued to speak with Trooper Keeler after being told that they would need to cease talking if he wanted a lawyer. **See** Opinion and Order, filed 3/4/21, at 6. The court also noted that Trooper Keeler informed Harris on multiple occasions that he could refuse to answer questions and could stop the interview at any time and request counsel. The court pointed out that Harris merely said that he "eventually" wanted to obtain counsel. **Id.** The court therefore concluded that "[Harris] did not clearly and unambiguously invoke his right[] to [an] attorney under **Miranda** and waived his rights under **Miranda** knowingly, intelligently, and voluntarily." **Id.** Regarding Harris's argument that his statement should be suppressed because the right to counsel had attached, the court concluded that although the right had attached, "[Harris] executed a valid waiver of his rights, including that of counsel, before he spoke with Keeler." **Id.** at 7.

Harris later filed a motion *in limine* on May 27, 2021, to preclude the Commonwealth from introducing the bad acts evidence identified in its Rule 404(b) notice. Harris argued that the evidence was propensity evidence and

---

[5] The court granted Harris' request to sever the case.

was more prejudicial than probative. He also argued that the acts listed were "somewhat similar acts." *See* Motion in Limine, filed 5/27/21, at ¶ 7.

Following a hearing, the court granted the motion in part and denied it in part. The court noted that the Commonwealth had agreed not to introduce Harris' prior conviction involving N.W. and had conceded that portions of the messages it wished to introduce were "unnecessary." *See* Opinion, filed 6/2/21 at 2 (citing Com. Exh. 3, at 7, 11-16). It also noted that Harris conceded that any messages explicitly mentioning P.C. were admissible but contended "that the context of the references to P.C. be limited to the fact that the conversation was sexual in nature." *Id.*

The court found the facts of the instant case and those of Harris' past crimes were "strikingly similar." *Id.* at 5. These similarities included:

- All the victims were white females between the ages of 10 and 14;
- All were in the same class in school;
- Harris either lived with or near the victims;
- Harris either was in a relationship with or friends with the victim's parent or guardian;
- Harris committed acts of digital and anal penetration as well as breast fondling and/or attempted vaginal penetration;
- Harris tried to keep the victims from telling anyone;
- Harris never used a condom; and
- All three victims were unwilling to tell the police initially.

*See id.* at 4-5.

The court determined that the entirety of messages between R.W. and Harris were admissible. It stated that they were "necessary to give context to the conversation regarding what [Harris] has done with P.C. and why." *Id.* at 6. However, the court determined that only the portions of the messages between A.W. and Harris that referenced P.C. were admissible. *Id.* It found that the messages with A.W. "connect[] all of the messages into one interconnected chain of events that are part of the natural development of the case." *Id.* It concluded that the probative value of the evidence outweighed any prejudice since the Commonwealth needed to rebut Harris's defense, it was not speculative, and was entirely relevant to the victim P.C. *See id.* Thus, the court entered an order that permitted portions of the messages into evidence. *See* Amended Order, filed 6/2/21.

The case proceeded to trial and the jury found Harris guilty of the above-referenced offenses. At sentencing, psychologist C. Townsend Velkroff testified as an expert for the Commonwealth that Harris was a sexually violent predator ("SVP"). *See* N.T., Sentencing, 9/14/21, at 13. During allocution, Harris said that he was sorry and that he needed help. *See id.* at 31. The court also heard testimony from P.C.'s mother that P.C. is on the autism spectrum. *See id.* at 32.

Before announcing its sentence, the court stated that it was taking into consideration "the reports that have been provided, the statements provided today . . . that [Harris] wants treatment, needs treatment[.]" *Id.* at 43. The court stated that it questioned the sincerity of Harris's desire for treatment

and that "his pleas now, you know, seem somewhat contrite compared to the manipulation he employed on this victim." *Id.* at 44. The court then stated that based on the offenses, Harris's actions, and his prior history that it would impose an aggregate term of 47 to 94 years of incarceration followed by a 36-month probationary period. It also found Harris to be an SVP.

Harris filed a post-sentence motion claiming that the trial court's sentence "is both exorbitant and disproportionate punishment considering the nature of the damage that was caused to both the victim and society in this case." Post-Sentence Motion, filed 9/23/21, at ¶ 13. The court denied the motion and this timely appeal followed. *See* Opinion and Order, filed 1/12/22.

Harris presents the following issues:

I.    Whether the [trial] [c]ourt erred in permitting the Commonwealth to present social media messages involving an out-of-county victim and an adult third party to improperly display criminal propensity.

II.   Whether the statements that [Harris] made to police while he was in custody should be suppressed because he expressed interest in obtaining counsel.

III.  Whether the sentencing court abused its discretion by imposing a manifestly excessive and unduly harsh sentence without sufficiently considering the fundamental norms underlying the sentencing process.

Harris's Br. at 9 (suggested answers omitted).

Harris's first issue challenges the court's admission into evidence of the messages that were the subject of his motion *in limine*. He argues that the messages showed criminal propensity and had little probative value. He also

maintains that the messages were not properly admissible as part of a common plan or scheme. He argues that any similarities were too vague to show a common pattern and that the victims and the offenses were distinctive.

He maintains as well that the messages were not admissible under the *res gestae* exception because they occurred after his abuse of P.C. He also alleges that his conversations with R.W. were not part of a common plan or scheme because they occurred "after the fact" and involved communication with a consenting adult who was not a victim in any past or present case. Harris's Br. at 21. According to Harris, because his conversations with R.W. were not criminal, and show that he had "lurid conversations" with both adult women and children, his conversations with A.W. could not be part of a distinctive criminal pattern. ***Id.***

No trial transcripts and no trial exhibits are in the certified record. As a result, we cannot review the evidence that was actually before the jury, and our review of this claim is hindered. Although the trial court bears some responsibility, it is ultimately the appellant's duty to ensure that the certified record on appeal contains all materials of record in the trial court necessary to resolve the appeal. ***See Commonwealth v. Bongiorno***, 905 A.2d 998, 1000 (Pa.Super. 2006) (*en banc*). A failure to carry out that duty results in waiver of any claim for which a needed item is not in the certified record. ***See Commonwealth v. Powell***, 956 A.2d 406, 423 (Pa. 2008). Harris's failure to ensure that the evidence at issue was in the certified record has waived this claim on appeal.

In any event, to the extent we can perform review based on the motion *in limine*, this issue is meritless. Rule 404(b) prohibits the admission of prior bad acts or unrelated criminal activity of an individual for purposes of propensity. *See* Pa.R.E. 404(b)(1). However, such acts may be admitted for the limited purpose of proving motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. *See id.* at 404(b)(2). A court should weigh the probative value of the evidence against any prejudicial effect. *See id.*

The proponent of bad acts evidence must show "a close factual nexus sufficient to demonstrate the connective relevance of the prior bad acts to the crime in question[.]" *Commonwealth v. Sami*, 243 A.3d 991, 999 (Pa.Super. 2020) (citation and emphasis omitted). Here, the Commonwealth proposed that the bad acts evidence established a common plan or scheme and were "part of a chain or sequence of events that form the history of this case and are part of its natural development." *See* Notice, at 4 (unpaginated).

To determine whether bad acts evidence is admissible as evidence of a common plan or scheme, the trial court should ascertain "the details and surrounding circumstances of each criminal incident to assure that the evidence reveals criminal conduct which is distinctive and so nearly identical as to become the signature of the same perpetrator." *Commonwealth v. G.D.M., Sr.*, 926 A.2d 984, 987 (Pa.Super. 2007) (citation omitted). Some factors relevant to this inquiry include the types of victims chosen by the

perpetrator, the time and place of committing the crimes, as well as the "patterns of action or conduct" by the perpetrator to commit the crime. *Id.*

Here, the court determined that the acts Harris committed against A.W. were "strikingly similar" to those against P.C. Both victims were white females between the ages of 10 and 14 at the time of the sexual abuse, and Harris had a relationship or friendship with their parents that gave him access to the children. In addition, he lived in or near the home during the abuse, and he digitally penetrated both victims vaginally and eventually escalated his abuse of the children to sexual intercourse.

As to the probative value of the evidence compared to any prejudice, the court determined that only a small portion of the conversation between Harris and A.W. was admissible. Balancing the potential for undue prejudice against the probative value of the messages, the court determined that only the parts of the messages referencing P.C. would be admitted. The trial court did not abuse its discretion in admitting this evidence because it established a common scheme or plan for Harris's assault on children. Because we conclude that the court did not err in the admission of these messages, we will not address Harris's additional argument that they were inadmissible under the *res gestae* exception.

Harris's second issue challenges the denial of his motion to suppress his statements. He alleges that he unambiguously asked for counsel. He points out that he mentioned wanting a lawyer four times and maintains that he was explicit in explaining that he would only continue speaking with Trooper Keeler

so that he could understand the charges against him. He also argues that his statements were involuntary because Trooper Keeler explained the *Miranda* warnings in a confusing and manipulative way. He contends that if his statement that he "probably will lawyer up" seems ambiguous, it is because he "did not know *when* he could assert his affirmative right to counsel as promulgated by the US Supreme Court in *Miranda*." Harris's Br. at 31 (emphasis in original). Harris likens his case to *Commonwealth v. Lukach*, 195 A.3d 176 (Pa. 2018).

Our standard of review of the denial of a motion to suppress is limited to determining whether the court's findings of fact are supported by the record and whether it has committed legal error. *See Commonwealth v. Jones*, 988 A.2d 649, 654 (Pa. 2010). We are bound by the court's factual findings that are supported by the record and will only reverse the order if the court has committed legal error. *See id.* Additionally, since the Commonwealth was the prevailing party, "we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole." *Id.*

"The main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel." *Berghuis v. Thompkins*, 560 U.S. 370, 383 (2010). The standard for determining whether someone has invoked their right to remain silent is the same as their right to counsel. *See id.* at 381. "[W]here an individual states that he wants an attorney, the interrogation must cease until an attorney is

present." ***Commonwealth v. Kunkle***, 79 A.3d 1173, 1183 (Pa.Super. 2013) (citation omitted). If, however, "a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." ***Davis v. United States***, 512 U.S. 452, 459 (1994) (emphasis in original).

The transcript and video of Harris's interview with Trooper Keeler were not included in the certified record. Again, it is the appellant's responsibility to ensure that the certified record includes all materials necessary for our review. ***See Bongiorno***, 905 A.2d at 1000. However, unlike the messages he challenged, Harris included the transcript in the appendix of his brief. Where an item in the record has not been included in the certified record but is contained in the reproduced record, we may consider it if the accuracy of the item is not disputed. ***See Commonwealth v. Holston***, 211 A.3d 1264, 1276 (Pa.Super. 2019); Pa.R.A.P. 1921 Note ("where the accuracy of a pertinent document is undisputed, the Court could consider that document if it was in the Reproduced Record, even though it was not in the record that had been transmitted to the Court") (citing ***Commonwealth v. Brown***, 52 A.3d 1139, 1145 n.4 (Pa. 2012)). Here, because the Commonwealth did not file a responsive brief or in any other way contest the accuracy of the transcript, we consider the transcript.

Harris mentioned a lawyer four times during the interview. We reproduce those instances below:

> **Trooper Keeler**: Now, the form I have here is a – is a waiver. It just – you signing it, says that you acknowledge your rights.
>
> **Harris**: Okay
>
> **Trooper Keeler**: If that makes sense. You're not writing a – you're not writing anything out, you're just basically saying that I read you your rights and that you understand them before we even get started with anything. Okay?
>
> **Harris**: And before we get started with anything, I'm not planning to be mean or nothing, but I probably will *lawyer* up.
>
> ***
>
> **Trooper Keeler**: So what's your – what's your ultimate goal out of all this?
>
> **Harris**: I just – I just want it dealt with.
>
> **Trooper Keeler**: Just let it fly at trial or take responsibility for all the things people are saying that you did?
>
> **Harris**: Yeah, but not all is true, though.
>
> **Trooper Keeler**: Well, what is true? Some of it has to be true.
>
> **Harris**: This is where the *lawyer* – like – I'm not – I don't wanna spend the rest of my life in prison.
>
> **Trooper Keeler**: That's understandable and I can't promise ya any kind of deal or anything like that. That's all up to the District Attorney's Office as – as far as any further court that's concerned. All I can do is hear you out on your side of everything. And if I have some facts wrong, by all means, correct me. But I know I don't have all my facts wrong.
>
> ***

**Trooper Keeler**: Now, would you be willing to take a polygraph examination about those topics?

**Harris**: That I'd have to talk to a *lawyer* about.

**Trooper Keeler**: Okay. That's fine. Just throwing it out there. If you wanted to know. Now, do you have any questions of me or anything -- anything else you wanna say?

**Harris**: And plus polygraphs aren't admissible in court.

**Trooper Keeler**: Noted.

**Harris**: I think. Right? Correct?

**Trooper Keeler**: Right. We – they're an investigative tool. They are useful.

**Harris**: No, I know.

**Trooper Keeler**: They are a useful too, but, yeah, you are correct.

**Harris**: I know.

**Trooper Keeler**: So that's – that's an option out there.

**Harris**: That I'd have to talk to a *lawyer* about.

**Trooper Keeler**: Correct.

\*\*\*

**Trooper Keeler**: -- to the prison. I can't just let ya walk outta here. So --

**Harris**: No, I know that.

**Trooper Keeler**: -- hang tight in here. I'm gonna put my stuff away.

**Harris**: Can you try and get ahold of my sister?

**Trooper Keeler**: Yeah, I'll call -- I'll can call your sister for ya and let her know where ya are and how to get ahold of ya and everything.

**Harris**: Well, I tried to get ahold of her so she can like --

> **Trooper Keeler**: Get money on your books and get your affairs in order.
>
> **Harris**: A *lawyer* and get numbers so I have local numbers. That's -- you know what I mean?
>
> **Trooper Keeler**: Yeah, get everybody in line for ya. Okay.

Transcript of Interview, dated 7/9/19, at 3-4, 19-20, 44, 45 (emphasis added).

The court did not abuse its discretion in denying Harris's motion to suppress his statements. None of his statements regarding a lawyer constituted an unambiguous request for counsel during the interview. Rather, they were statements either relating to or contingent on future events. The statement that he "would" have to talk to a lawyer about a polygraph, in context, where the trooper asked him if he "would be willing" to take a polygraph, related to a potential future event. Indeed, Harris did not plainly say in this instance that he wanted a lawyer for the interview. The only person that Harris clearly said he wanted to contact was his sister, and that she would contact a lawyer. In any event, this statement was at the conclusion of the interview. As the trial court concluded, "[Harris] did not clearly and unambiguously invoke his rights to attorney under *Miranda* and waived his rights under *Miranda* knowingly, intelligently, and voluntarily." Opinion and Order at 6.

Furthermore, his reliance on *Lukach* is misplaced. In *Lukach*, the appellant was accused of homicide and later interviewed by police. At some point in his interview, in response to the officer's question, Lukach stated

"Yeah. I don't know just, I'm done talking. I don't have nothing to talk about." *Lukach*, 195 A.3d at 179. The officer continued to question Lukach. Following a motion to suppress, the court granted the suppression of Lukach's statements. We affirmed and our Supreme Court agreed. Our Supreme Court held that Lukach had unambiguously invoked his *Miranda* right to remain silent and that the officer had violated this right by continuing to question Lukach.

*Lukach* dealt with the *Miranda* right to remain silent, and the suspect's statements in *Lukach* that he was "done talking" and had "nothing more to say" were plain statements of the desire to invoke that right there and then. In contrast, here, Harris's statements were not nearly so clear an invocation of the right. Rather, his statements were conditional or related to possible occurrences in the future. Furthermore, Harris's argument that Trooper Keeler explained the *Miranda* waiver form in a confusing and manipulative way is unsupported by the record. Trooper Keeler repeatedly told Harris to read the form himself after Trooper Keeler explained the contents of the form. At any points of confusion that Harris had, he asked for clarity and was given that by Trooper Keeler. *See* Com. Exh. 3 at 3-6. Harris's claim is meritless.

Harris's final claim is that the court imposed a manifestly excessive and unduly harsh sentence. He alleges that the court did not consider his rehabilitative needs. He also maintains that though the court stated on the record what it considered in drafting his sentence, it "did not reiterate what facts he was relying on." Harris's Br. at 35.

This issue challenges the discretionary aspects of his sentence. Before we may review the merits of this claim, we must first determine whether Harris: 1) filed a timely notice of appeal; 2) preserved his claim in a post-sentence motion or at the sentencing hearing; 3) complied with the requirements of Pa.R.A.P. 2119(f); and 4) presents a substantial question that the sentence imposed is not appropriate under the Sentencing Code. **See Commonwealth v. Dempster**, 187 A.3d 266, 272 (Pa.Super. 2018).

Here, Harris filed a timely notice of appeal, but he did not preserve his claim either in his post-sentence motion or at the sentencing hearing. On appeal, he claims that the court imposed an unduly harsh and excessive sentence. He also claims that the court failed to consider his rehabilitative needs and did not specify what facts the court relied on in determining his sentence. Harris filed a post-sentence motion, but he claimed that the sentence was "exorbitant and disproportionate" considering the nature of the harms caused to the victim, which he does not raise before this Court. **See** Post-Sentence Motion at ¶ 8. As such, we will not review his sentencing challenge. **See Commonwealth v. Griffin**, 65 A.3d 932, 935 (Pa.Super. 2013) (concluding waiver of challenge to discretionary aspects of sentence where defendant did not raise the issues in a post-sentence motion). We thus affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/21/2022